**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 14, 2014**

# In the Court of Appeals of Georgia

A13A1924. HUTCHINS v. THE STATE.                    JE-074C

ELLINGTON, Presiding Judge.

A Walton County jury found Amanda Hutchins guilty of violating OCGA § 16-13-30.5 (a) (2), pertaining to the use or conveyance of certain substances used in the manufacture of controlled substances;[1] and OCGA § 16-5-73 (b) (1), pertaining to the presence of children during the manufacture of methamphetamine.[2] Hutchins appeals from the denial of her motion for a new trial, contending that her trial counsel was ineffective, that the trial court erred in giving certain jury instructions, and that the

---

[1] The State alleged that she violated this Code section by possessing pseudoephedrine tablets and other items "with the intent to knowingly convey" them to others "for use in the manufacture of methamphetamine[.]"

[2] The State alleged that she violated this Code section when she "did intentionally cause and permit a child under the age of 18 years[ ] to be present where methamphetamine was being manufactured[.]"

evidence was insufficient to support the convictions. For the reasons that follow, we reverse the judgments of conviction.

1. Hutchins contends that the State's evidence on the issue of her guilt for the crimes charged was circumstantial and was insufficient to support her convictions beyond a reasonable doubt. When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SC 2781, 61 LE2d 560) (1979). It is the duty of the jury, not this Court, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. Id. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." (Citation and punctuation omitted.) *Miller v. State*, 273 Ga. 831, 832 (546 SE2d 524) (2001).

Further, under former OCGA § 24-4-6,[3] "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." See *Merritt v. State*, 285 Ga. 778, 779 (1) (683 SE2d 855) (2009). A reasonable hypothesis is one founded in the evidence. See *Smith v. State*, 284 Ga. 304, 306 (2) (667 SE2d 65) (2008). Whether an alternative hypothesis is reasonable is a question generally committed to the jury that heard the evidence, "and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, the appellate court will not disturb that finding, unless the verdict of guilty is unsupportable as a matter of law." (Citations and punctuation omitted.) *Phillips v. State*, 287 Ga. 560, 562 (1) (697 SE2d 818) (2010). Viewed in the light most favorable to the jury's verdict,[4] the record contains the following relevant[5] evidence. Amanda Hutchins and

---

[3] Because this case was tried before January 1, 2013, our new Evidence Code does not apply. See Ga. L. 2011, pp. 99, 214, § 101. We note that this evidentiary rule is now found at OCGA § 24-14-6.

[4] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[5] We note that the State presented the testimony of the lead investigator, who testified that Hutchins was rumored to be part of a "pill ring" that had obtained narcotics for others. Trial counsel failed to object to the admission of that testimony,

3

her three-year-old child lived with her mother, Elaine Calmes, and her mother's husband, William Calmes, from January through August of 2011 at their home in Walton County. In early 2011, an investigator with the Walton County Sheriff's Office received a tip from confidential informants that methamphetamine was being manufactured and sold from the Calmeses' property. Using confidential informants, the investigator made two "controlled buys" of methamphetamine from that address. On April 8 and August 11, 2011, William Calmes sold an informant drugs. Prior to these two transactions, an informant had purchased methamphetamine from Elaine Calmes at a public library. Although the investigating officer testified that an informant told him that Hutchins was at home during one of the drug sales, there is no evidence that Hutchins witnessed the transactions. Further, there is no evidence that her child was present during the drug sales. Based on the evidence of the drugs sales and a statement from the informant that methamphetamine was being manufactured in a shed on the property, the investigator obtained a warrant to search the premises.

---

and counsel's alleged deficient performance forms the basis of one of Hutchins' claims of error. See Division 2, infra. However, because that evidence should have been excluded, we do not include it in the statement of relevant facts.

4

The investigator and other officers executed the search warrant at 9:00 a.m. on August 22, 2011. Hutchins, her boyfriend, the Calmeses, and a guest were present in the home. The child was in daycare. After the officers secured the home, an investigator told Hutchins that he suspected her mother of manufacturing methamphetamine and asked where her mother kept the pseudoephedrine. Hutchins led the investigator to a cabinet over the stove from which he recovered two packages of the drug. The investigator testified that Hutchins told him that her mother had obtained the pseudoephedrine the night before. The prosecution offered no store receipts or other records or testimony establishing when and where the pseudoephedrine had been purchased or by whom. The investigators also found other items in the kitchen cabinets that could be used to make methamphetamine, including Epsom salts, baking soda, coffee filters, hydrogen peroxide, a Coleman camping stove, and propane fuel. Hutchins told the police that she knew her mother had, in the past, kept supplies for making methamphetamine on the property.

The investigators found no drugs or materials for manufacturing methamphetamine in Hutchins' bedroom or in the bathrooms. On the top shelf of a closet in the Calmeses' bedroom, the investigators found a metal pot and three bottles containing clear liquids. A test of the liquid in one of the bottles revealed the presence

of methamphetamine. The investigators recovered small packages of suspected methamphetamine from the Calmeses' bedroom. They also found Elaine Calmes' recipe for making methamphetamine. In a drawer in the living room, investigators found plastic bags containing jars of lye and opened cold packs, items used in making methamphetamine. The investigators also found a glass pipe in the living room, but they did not test it for drug residue. In the back yard, the police found a pile of partially burnt trash which contained, among other things, empty pseudoephedrine blister packs and plastic bottles. A GBI agent described the Calmeses' method of making methamphetamine a "one pot" or a "shake and bake" operation, one that would yield the drug in a "quick process."

Based on the quantity and type of substances found in the Calmses' home, investigators opined that the home was an "active meth lab." Although there was no evidence of anything resembling an assembled lab, and the house did not smell of chemicals associated with the process of manufacturing methamphetamine, the investigators explained that methamphetamine could be manufactured quickly anywhere in the house. Elaine Calmes admitted to an investigator that she had made methamphetamine in the past and that she was thinking about doing it again. She said that Hutchins had no involvement with the drugs. William Calmes told the

6

investigator that his wife had made methamphetamine in the past, but that she "runs [family members] out of the house when she does it." The investigator admitted that the confidential informant had told him that he had seen the methamphetamine being manufactured in the shed behind the house.

Hutchins testified in her defense, and she told the jury that she knew that her mother had a drug problem and that her mother had made methamphetamine in the past, but she testified that she was unaware that her mother had resumed making the drug. Hutchins said she would not have brought her child to stay there had she known. Hutchins worked days and had never smelled anything in the house to make her suspect the existence of a meth lab. She admitted that she had bought pseudoephedrine at her mother's request over a year before the house was searched, but that it was for her stepfather's use for a sinus congestion. She admitted showing the investigators where her mother kept the pseudoephedrine, but also noted that the cabinet contained other over-the-counter medicines. She admitted showing the investigators the kitchen cabinets containing the other chemicals, but she explained that the items were ordinary household products to her. She testified that her parents burned trash in the back yard because they had no trash pick-up. She also testified that the shed in the back yard was her father's, and that he kept it locked and

monitored by an alarm system. She did not enter her parents' bedroom, and their room was kept locked when they were out.

(a) The State failed to present sufficient evidence to allow the jury to find beyond a reasonable doubt that Hutchins violated OCGA § 16-13-30.5 (a) (2) as alleged in the indictment. The State averred that Hutchins, on or about August 22, 2011, unlawfully possessed a list of household items, including pseudoephedrine, "with the intent to knowingly convey" those items to the Calmeses "for use in the manufacture of methamphetamine[.]"

The evidence shows that all of the items listed in the indictment were found in common areas of the house. Though Hutchins was arguably in joint possession of the items, there was no evidence that she alone possessed them or that she had the present intent *to convey* them because those items were also in the joint possession of the Calmeses. While it is possible that Hutchins may have had sole possession of the items in the recent past with the requisite intent to convey them to the Calmeses for the alleged illegal use, the State submitted no evidence from which the jury might reasonably draw that inference.

At most, Hutchins' testimony establishes that her mother bought the two boxes of pseudoephedrine found in the cabinet. Even if the jury discounted Hutchins'

8

testimony and assumed that she had lied, there is still no evidence establishing that Hutchins had possessed the pseudoephedrine with the requisite intent of conveying it to the Calmeses for the manufacture of methamphetamine. The only evidence the State adduced linking Hutchins to any of the household items listed in the indictment was her awareness of and proximity to them. Given only that evidence, the jury would only be able to speculate as to whether Hutchins had recently had sole possession of those items and, if so, whether she had intended to convey them to the Calmeses. Thus, there is no evidence in this entirely circumstantial case from which a jury could exclude every other reasonable hypothesis save that of the guilt of the accused; therefore, the evidence was insufficient to support the jury's verdict of guilt as to this conviction beyond a reasonable doubt. See, e.g., *In the Interest of J. S.*, 303 Ga. App. 788, 790-791 (1) (694 SE2d 375) (2010) (The circumstantial evidence of the defendant's spatial proximity to cocaine concealed in a car's console did not satisfy the state's burden of excluding every other reasonable hypothesis as to why defendant moved his hands near the console, nor did it prove his constructive possession of the cocaine.); *Parker v. State*, 297 Ga. App. 384, 386-387 (1) (677 SE2d 345) (2009) (The circumstantial evidence did not exclude the reasonable hypothesis that the defendant was at the victim's barn to return an item that he was alleged to have

9

burgled.). Accordingly, Hutchins' conviction for violating OCGA § 16-13-30.5 (a) (2) must be reversed.

(b) However, the State presented sufficient evidence to allow the jury to find beyond a reasonable doubt that Hutchins violated OCGA § 16-5-73 (b) (1) as alleged in the indictment. The State contended that, on or about August 22, 2011, Hutchins "did intentionally cause and permit a child under the age of 18 years[ ] to be present where methamphetamine was being manufactured" by the Calmeses.[6]

It is clear from the record evidence that the Calmeses sold and possessed methamphetamine, that a confidential informant had seen a meth lab in the shed behind the Calmeses' home, and that the Calmeses possessed the chemicals and the equipment for making methamphetamine. Given this evidence, as well as the opinion testimony of the investigators, a jury could reasonably infer that the Calmeses were actively manufacturing methamphetamine on their property. The jury could also infer from the evidence that Hutchins was aware that her mother was manufacturing methamphetamine, and that she intentionally permitted her three-year-old child to live in the home while that activity was occurring. While it is conceivable, as Hutchins

_____

[6] We note that the State could have indicted Hutchins for intentionally causing or permitting a child "to be present where any person is . . . possessing a chemical substance with the intent to manufacture methamphetamine," as provided in OCGA § 16-5-73 (b) (1), but that the State chose not to do so.

10

testified, that she was unaware that her mother had resumed manufacturing methamphetamine, the jury was authorized to conclude from the evidence that such a hypothesis was unreasonable given the following: Hutchins knew how methamphetamine was manufactured and what it smelled like, she knew that the chemicals needed to make methamphetamine were present in the home, and she knew that her mother had a history of manufacturing and selling the drug from her home. Although the evidence of Hutchins' guilt is circumstantial, the jury could nevertheless exclude every other reasonable hypothesis save that of the guilt of the accused; therefore the evidence was sufficient to support the jury's verdict as to Hutchins' conviction for violating OCGA § 16-5-73 (b) (1) beyond a reasonable doubt. See, e.g., *Green v. State*, 283 Ga. 126, 130 (1) (657 SE2d 221) (2008); *Bryant v. State*, 282 Ga. 631, 634 (1) (651 SE2d 718) (2007).

2. Hutchins contends that her trial counsel provided ineffective assistance by, inter alia, failing to object to inadmissible bad character evidence. We agree, and, for the following reasons, we reverse.

Under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LEd2d 674) (1984), "[t]o prevail on a claim of ineffective assistance of trial counsel, [Hutchins] bears the burden of showing both that trial counsel was deficient and that [she] was

11

prejudiced by the deficiency." (Citations omitted.) *Welbon v. State*, 278 Ga. 312, 313 (2) (602 SE2d 610) (2004). Concerning the first prong of the *Strickland* test, Hutchins "must overcome the strong presumption that counsel's conduct falls within the broad range of reasonable professional conduct." (Citations and punctuation omitted.) *Morgan v. State*, 275 Ga. 222, 227 (10) (564 SE2d 192) (2002). In order to show the requisite prejudice, Hutchins "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]" (Citations and punctuation omitted.) *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009). When reviewing an ineffective assistance claim, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citations omitted.) *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000).

The trial transcript reveals that the lead investigator testified at length during the State's case in chief concerning Hutchins' alleged involvement in a suspected illegal "pill ring." Counsel interposed no objection to this testimony, and the record does not indicate that the State had been allowed to inquire into Hutchins' participation in the pill ring as a similar transaction. The following excerpts from the lead investigator's testimony were admitted without objection:

12

[I r]eceived information from the confidential informant that Amanda Hutchins was involved in obtaining . . . oxycodone and OxyContin, which are very addictive prescription drugs, another huge problem in our county. The informant advised me that [Hutchins] was involved with the Youngs but did not know which Youngs it was. The Youngs are a family in our county. Some of them are involved in the movement of prescription drugs through our country. What they'll do is they'll go out and they'll send out people to obtain a prescription from a doctor's office for pain medication, pain clinics. They'll go get the oxycodone, the roxys, which are, you can gain anywhere from $15 to $20 a pill on the street. It's an opiate. It's a Schedule II-level narcotic, which is very addictive. It's very addictive to these people. . . . .

I asked [Hutchins] to tell me about the people she was taking to the doctor fraudulently to obtain prescription medications. [She] told me that she had taken people to the doctor but did not know what they did with the pills after that, which again, I seen a lot of deception. I asked [Hutchins], whom do you take to the doctor. She said she took some of the Youngs. At that point, these particular people are of great interest to our narcotics unit.

The investigator also testified, without objection, as to his opinion of Hutchins' truthfulness:

I can tell deception right away. I've had hundreds of hours of interviews, interrogation schools. [Hutchins] was being deceptive. She knew what

13

was there. She knew where the chemicals were. She showed me where the stuff was. She knew what was going on in that house.

The investigator also testified that he believed that Hutchins was aware of drug sales being made from the Calmeses's home, and he gave that opinion after reiterating that he had heard that Hutchins was part of a pill ring.

The prosecutor also thoroughly cross-examined Hutchins on her involvement in what the State characterized as a "massive narcotics pill ring." During cross-examination, the prosecutor stated that the confidential informant had implicated Hutchins in the pill ring, asserted that Hutchins had bought pills at the behest of a specific person, and argued that Hutchins knew that some of these pills were being distributed to her mother. When the prosecutor asked Hutchins whether she knew that members of the pill ring were involved in criminal activity, defense counsel finally objected. Given that evidence concerning the pill ring had already been admitted, however, the court allowed the question but instructed the prosecutor not to state whether Hutchins' alleged involvement in the pill ring expressly constituted criminal activity.

Statements that Hutchins participated in a conspiracy to fraudulently obtain prescription narcotics and to resell them in a street-level drug operation was

14

objectionable as it was improper character evidence. See *Johnson v. State*, 275 Ga. 508, 510 (3) (570 SE2d 292) (2002) (The trial court erred in admitting evidence of prior independent crimes when the defendant had not placed his character in issue and when the prior crimes had not been admitted as similar transactions.); *Doyal v. State*, 287 Ga. App. 667, 669 (2) (653 SE2d 52) (2007) (The trial court erred in admitting an officer's testimony that he had received complaints that the defendant was selling methamphetamine as that evidence improperly placed the defendant's character in issue.). At the hearing on Hutchins' motion for new trial, Hutchins' trial counsel offered no strategic basis for admitting the evidence; rather she testified that she did not think the evidence was harmful. As there was no strategic reason for failing to object to this bad character evidence, counsel's performance was deficient and the trial court erred in holding otherwise. See *Emilio v. State*, 263 Ga. App. 604, 605 (1) (588 SE2d 797) (2003) (Counsel was deficient in eliciting statements accusing the defendant of trafficking, statements which constituted bad character evidence.); *Harris v. State*, 251 Ga. App. 879, 881 (3) (555 SE2d 485) (2001) (Counsel was deficient in failing to object to testimony that defendant had been charged with robbery in another jurisdiction.). Accordingly, we now turn to the second prong of Hutchins' ineffective assistance claim.

15

We note that, in her closing argument, the prosecutor explained the reason she solicited the evidence about the pill ring:

> And I had a reason. And it goes to this case, and it goes hand in hand with this case because it was about getting pills, getting pills for someone who is highly suspected of running an illegal operation and then just not asking any questions about it. Getting paid for it. Not going to ask any questions. Not involved. I don't know. What did she do in this case? Yeah, I got Pseudoephedrine, yeah. . . . .

> No, this is not about drug addicts. This is about drug dealers, and this is about a meth lab, and this is about the fact that [Hutchins] knew it was there.

It is clear that the prosecution used the evidence concerning Hutchins' involvement in the alleged pill ring to cast her in the role of a drug dealer with an intimate knowledge of the drug trade gleaned from personal experience. Such evidence also demonstrates, as the prosecutor argued, that Hutchins had a propensity to commit the type of crime for which she was charged – buying pills for someone else. Thus, the evidence severely undermined Hutchins' credibility with respect to key issues at trial: whether she knew that the pseudoephedrine pills and other chemicals in the house were being used by her mother to manufacture methamphetamine and, given that knowledge, whether she intentionally permitted her

16

child to be present where methamphetamine was being manufactured. Given that the evidence in this case was circumstantial and that the jury's finding of guilt turned on what Hutchins reasonably should have deduced from the evidence recovered from the home, we must conclude that there is a reasonable probability that the outcome would have been different had it not been for trial counsel's deficient performance in failing to exclude this bad character evidence. See *Emilio v. State*, 263 Ga. App. 604, 605 (1) (588 SE2d 797) (2003) (There was a reasonable probability that the outcome would have been different had it not been for trial counsel's deficient performance in allowing the jury to hear that the defendant had outstanding criminal warrants.); *Harris v. State*, 251 Ga. App. 879, 881 (3) (555 SE2d 485) (2001) (In a case that turned largely on the credibility of the defendant, there was a reasonable probability that the outcome would have been different had it not been for counsel's deficient performance in allowing in evidence of the defendant's criminal history.). See also *Merritt v. State*, 255 Ga. 459, 460 (2) (339 SE2d 594) (1986) ("We strongly disapprove the gratuitous introduction of irrelevant and prejudicial [character evidence], particularly where, as here, the prejudicial testimony is elicited from a witness by the prosecutor.").

3. Hutchins contends the trial court erred in giving a charge on willful blindness. Although we have reversed Hutchins' convictions on other grounds, we address this claim of error because it may recur on retrial. The court charged the jury as follows:

> The element of knowledge, intent, may be satisfied by inferences drawn from proof that a defendant deliberately closed her eyes to what would otherwise have been obvious to her. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of a fact. Again, whether or not you draw any such inference is a matter solely within your discretion.

As we have held, a charge on willful blindness or deliberate ignorance is

> appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. A court should not instruct a jury on deliberate ignorance when the evidence points to actual knowledge or no knowledge on the defendant's part.

(Footnotes omitted.) *Williamson v. State*, 300 Ga. App. 538, 549 (6) (685 SE2d 784) (2009). Further, "[t]he deliberate ignorance instruction, when appropriate, provides another way to satisfy the knowledge element of a criminal offense, not the intent

18

element." (Footnote omitted.) Id. at 549-550 (6). Consequently, a charge on deliberate ignorance that equates knowledge with intent, or which tends to confuse those concepts, is erroneous. Id. Although the record before us contains some evidence which would support a deliberate ignorance or willful blindness charge, giving the instant charge was error under the circumstances because it contained language which could have misled the jury into equating knowledge with intent. See id.

*Judgment reversed. Phipps, C. J., and Branch, J., concur*.