307 Ga. 12
FINAL COPY

S19A0785.  HOWARD v. THE STATE.

BOGGS, Justice.

Appellant Bahir Ramiz Howard was convicted of murder and related crimes for the 2010 shooting death of Jerode Martez Paige. He appeals, asserting error in several jury instructions and violation of his constitutional right to be present during his trial. For the reasons stated below, we affirm.[1]

---

[1] The crimes occurred on May 15, 2010. On August 12, 2011, a Spalding County grand jury indicted Howard for malice murder, felony murder, aggravated assault, criminal gang activity in the commission of murder, discharge of a firearm near a public highway, carrying a deadly weapon to a public gathering, and possession of a firearm during the commission of a crime. Howard was tried before a jury on July 9 to 13, 2012, and found guilty of all charges except that of criminal gang activity, as to which the jury found him not guilty. The trial court sentenced Howard to serve life in prison for malice murder, twelve months to serve concurrently with the malice murder count on the first two firearms charges, and five years consecutive for possession of a firearm during the commission of a crime; the remaining counts were vacated by operation of law or merged. On July 26, 2012, Howard, acting pro se, filed a motion for new trial. Thereafter current appellate counsel undertook representation and filed several amended motions. After a hearing on September 7, 2017, the trial court denied the motion on October 1, 2018. Howard's initial pro se motion was a nullity, however, because he was still represented by counsel at the time of filing. Accordingly, this Court dismissed Howard's appeal, noting that Howard could seek an out-of-time appeal.

1. Construed in the light most favorable to the jury's verdicts, the evidence showed that Paige a/k/a "Yung Hott" was filming a rap video in Griffin. One of the sites was located on the east side of Griffin, which witnesses testified is considered the territory of the Crips gang, which uses the color blue as an identifying mark. According to Leonard Taylor, the video producer and owner of Paige's record label, Paige was not a gang member, but his record label had a red color theme. The color red is an identifying mark of the Bloods gang, a rival of the Crips. During the filming, Taylor noticed that various individuals wearing blue had suddenly appeared on the scene, and Taylor expressed his concerns to Paige, who told him "everything is cool" because he had made arrangements to film there.[2] Taylor still felt uncomfortable and instructed the video crew to "shut it down" and resume filming on the other side of town. Paige walked over to a nearby truck to tell

Permission to file an out-of-time appeal was granted by consent order on December 26, 2018, and Howard filed a timely notice of appeal. The case was docketed in this Court for the April 2019 term and was orally argued on May 7, 2019.

[2] Witnesses agreed that at least 200 people were on the scene.

2

the owner where the filming would resume. Taylor saw Paige come back, limping, and fall as Taylor heard gunshots. A man came running after Paige, stood over him, and shot him in the head at close range, killing him. Multiple gunshots were fired thereafter.[3] Taylor identified Howard from a police photo lineup and in the courtroom as the shooter.

Willie Hollis, who was at the video shoot with Paige, had walked with Paige to look for the truck's owner. He testified that Howard told Paige to "go and wrap it up. Get out from over there." Paige replied, "I'm on your side of town. What you want to do?" Howard said nothing more but "[p]ulled out a gun and started shooting." At that point, no other shots had been fired, but when Hollis heard more shots, he "took off running." Hollis identified Howard in a police photo lineup and in court as the shooter.

Jaquonto Redding, Paige's half-brother, testified that he was

---

[3] Police investigators on the scene found numerous spent shells of various calibers, including steel Wolf brand shells in .40 Smith & Wesson caliber and brass shells from 9mm and .45 Auto ammunition, as well as one unfired .45 Auto round and three spent 12-gauge shotgun shells.

standing some distance away when he saw Paige say something to Howard and turn around. Howard then pulled out a gun and shot Paige, who stumbled back and fell as Howard shot him again. Howard walked up to Paige, stood over him, and appeared to be trying to cock or clear his pistol. Redding then left the scene. Redding identified Howard from a police photo lineup and in court as the shooter. He testified that Howard shot first, and "then there was a lot of shots fired." Five individuals were struck, including Paige and Howard.

Octavius White, a close friend of Paige, testified that he saw Howard and a group of men wearing blue bandannas speak with Paige, and then Howard pulled out a gun and shot Paige. He testified that Howard's was the first shot fired on the scene. Paige stumbled back and fell to the ground, "holding his hands up in the air like if he was saying don't shoot me, don't shoot me." Howard walked up to Paige lying on the ground and "just pulled the trigger." White identified Howard in court as the shooter.

The medical examiner testified that Paige suffered multiple

4

gunshot wounds to his lower extremities, including a wound to his right thigh that shattered the femur, which would have made it difficult for him to walk or run, and probably would have caused him to fall. Paige suffered a total of six gunshot wounds, including a bullet that entered near his right temple, passed through the brain and a portion of the brain stem, and lodged under the skin of his left cheekbone. This wound was "immediately lethal" and caused "instantaneous death." Given testimony that Paige was moving after he was shot, the medical examiner agreed that the gunshot wound to his temple could not have been the first wound he suffered. The bullet that lodged in Paige's head was removed by the medical examiner, and a firearms examiner identified it as a .40-caliber bullet "consistent with being fired from a Smith & Wesson .40 pistol."

In addition, two other individuals picked Howard out of a photo lineup as the man who shot Paige, four other individuals identified Howard as one of the people firing a gun at the scene, and a gun

5

shop owner testified that he sold Howard a Smith & Wesson .40-caliber pistol and that his shop carried Wolf brand .40-caliber ammunition. Howard told police that he did not know what happened to his pistol, and it was never found.

Although Howard has not challenged the sufficiency of the evidence to support his convictions, as is this Court's practice in murder cases, we have reviewed the record to determine the legal sufficiency of the evidence. We conclude that the evidence summarized above was more than sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Howard was guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (99 SCt 2781, 61 LE2d 560) (1979); see also *Strother v. State*, 305 Ga. 838, 842 (2) (828 SE2d 327) (2019) ("It is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." (Citations and punctuation omitted.))

2. In his first enumeration of error, Howard argues that the

trial court erred in instructing the jury, after a juror was excused

and replaced with an alternate, with the following charge:

> COURT: Ladies and gentlemen, I have made the decision to excuse [Juror No. 22] from participation on the jury. So, ma'am, you will be excused shortly, and you will be free to go. [Juror No. 56], you will be taking her place on the jury. So you will go back into the jury room at this point. You all will need to kind of start fresh with your deliberations with [Juror No. 56] and get him caught up to speed. And sir, you catch them up to speed with your thoughts on this case also. Resume your deliberations at this time. With that, [Juror No. 22], do you have any personal items in the jury room?
> JUROR [No. 22]: (Nods head affirmatively.)
> COURT: Okay. You will be allowed to get those and then you will be free to go. And the rest of you, I will ask that you resume your deliberations with [Juror No. 56]. Thank you.

As Howard acknowledges, he failed to object to this instruction

at the time it was given, and thus must demonstrate plain error:

that the error was not affirmatively waived; that it was obvious

beyond reasonable dispute; that it likely affected the outcome of the

proceedings; and that it seriously affected the fairness, integrity, or

public reputation of the proceedings. See OCGA § 17-8-58 (b); *State*

*v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011). Howard has failed

to meet this standard.

Howard contends that the trial court's instruction, by using the terms "start fresh," "get him caught up to speed," "catch them up to speed," and "resume your deliberations," failed sufficiently to instruct the jury that it must begin its deliberations anew, thus placing the alternate in the position of being coerced to comply with the prior deliberations of the other jurors. This argument, however, is foreclosed by this Court's decision in *Sharpe v. State*, 288 Ga. 565, 569 (7) (707 SE2d 338) (2011), in which a very similar instruction was given to the jury, after the trial court told jurors "that it wanted them to deliberate more on the case" after a juror was replaced with an alternate. The trial court further instructed the jury:

> When I told you to start fresh today, that was because I wanted you to have a fresh start and also you need to bring [the alternate] on board, too, since she has joined you rather late in the game and you need to bring her up to speed by going over where you've been before. And I trust that you've done that.

Id. This Court held that "start[ing] deliberations anew . . . is exactly what the trial court, in essence, did instruct the reconstituted jury

8

to do by bringing [the alternate] 'up to speed' after making a 'fresh start.'" Id. at 570 (7). The remarkably similar language employed by the trial court here likewise instructed the jury to begin its deliberations anew, with the additional instruction that the alternate "catch them up to speed with [his] thoughts on this case also," thus militating against the possibility of coercion urged by Howard.[4]

Relying almost exclusively upon decisions from a number of federal courts of appeal and state courts, Howard contends that the substitution of an alternate juror without a clear instruction that the jury must start deliberating again from the very beginning had an "inherently coercive effect" and deprived Howard of a fairly constituted jury. But this argument overlooks important distinctions between the law applicable in those cases and the law

---

[4] Howard's assertion that the trial court's initial charge to the alternate jurors before deliberation began was erroneous because it included the term "get caught up to speed on any negotiation[s] that have taken place" is likewise without merit, given that the trial court in *Sharpe* instructed the jury to "bring [the alternate] up to speed *by going over where you've been before.*" (Punctuation omitted; emphasis supplied.) *Sharpe*, 288 Ga. at 569.

of Georgia, particularly the fundamental difference between federal and Georgia criminal procedure on this point.

The replacement of an incapacitated juror is governed in Georgia by OCGA § 15-12-172, which prescribes the method for substituting an alternate juror "at any time, whether before or after final submission of the case to the jury."[5] In stark contrast, before 1999, Rule 24 (c) of the Federal Rules of Criminal Procedure provided, in relevant part: "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."[6] The federal cases cited by Howard were decided under

_____

[5] OCGA § 15-12-172 provides in its entirety:

　　If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated. Further replacements shall be made in similar numerical sequence provided the alternate jurors have not been discharged. An alternate juror taking the place of any incapacitated juror shall thereafter be deemed to be a member of the jury of 12 and shall have full power to take part in the deliberations of the jury and the finding of the verdict. Any verdict found by any jury having thereon alternate jurors shall have the same force, effect, and validity as if found by the original jury of 12.

[6] The 1999 amendment altered that provision as follows:

　　*Retaining Alternate Jurors.* The court may retain alternate

10

that *former* rule. See, e.g., *United States v. Josefik*, 753 F2d 585, 587 (7th Cir. 1985); *United States v. Lamb*, 529 F2d 1153 (9th Cir. 1975). But even under the former federal rule, the Eleventh Circuit explicitly declined to follow *Lamb*, preferring instead to interpret the former rule to permit substitution of an alternate juror even after the jury began deliberations, so long as the jury was "instructed to begin its deliberations anew." See *United States v. Barker*, 735 F2d 1280, 1282 (11th Cir. 1984) (citing *United States v. Phillips*, 664 F2d 971, 990-997 (II) (5th Cir. 1981)). The revised federal rule appears to have adopted that approach.

Similarly, the state decisions cited by Howard rely upon statutory provisions similar to the post-1999 federal rule, explicitly requiring trial courts to instruct the jury to begin its deliberations anew. See, e.g., *State v. Corne*, 134 Wash. App. 1017 (2006)

---

jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

Fed. R. Crim. P. 24 (c) (3).

(affirming by unpublished per curiam opinion) (citing Washington Superior Court Criminal Rule 6.5 ("If the jury has commenced deliberations prior to replacement of an initial juror with an alternate juror, the jury shall be instructed to disregard all previous deliberations and begin deliberations anew.")); *State v. Gomez*, 138 Idaho 31, 34 (56 P3d 1281) (Idaho App. 2002) (citing Idaho Criminal Rule 24 (d) (2) ("If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."), as well as the lengthy, specific jury instruction required by Idaho Criminal Jury Instruction 231). Georgia's statute governing the replacement of a juror with an alternate contains no such provision.

The decisions cited by Howard therefore are inconsistent with Georgia's statutory scheme for alternate jurors as laid out in OCGA § 15-12-168 et seq., particularly the provision that the trial court may for good cause substitute an alternate "whether before or after final submission of the case to the jury." OCGA § 15-12-172. As this Court noted in *Tanner v. State*, 242 Ga. 437, 437-438 (1) (249 SE2d

12

238) (1978), explicitly rejecting inter alia the *Lamb* decision relied upon by Howard:

> The cases relied upon by Tanner are based on the Federal Rules of Criminal Procedure and the laws and constitutions of other jurisdictions. These cases neither are binding upon us nor are they persuasive in their analysis. . . . When an alternate later is admitted to the panel of twelve in substitution for an original, he has full access to previous deliberations and may apprise himself of what has transpired in his absence by asking appropriate questions or by listening to the deliberations. We shall presume that he casts his vote knowingly and intelligently. Our statute promotes the important state interest of judicial efficiency by avoiding unnecessary retrials when a juror who is participating in a case becomes unable to continue.

(Citations omitted.)

For the same reasons, we find the cases cited by Howard from other jurisdictions unpersuasive, particularly in light of our opinion in *Sharpe*.[7] Howard cannot demonstrate error, and certainly not

---

[7] In the Georgia decisions cited by Howard, the jury instruction given after seating an alternate was mentioned, but was not raised as an issue by the parties. See, e.g., *Wallace v. State*, 303 Ga. 34, 36 (2) (810 SE2d 93) (2018) (holding trial court did not abuse discretion in dismissing holdout juror); *Compton v. Jackson*, 295 Ga. 777, 778-779 (764 SE2d 142) (2014) (on habeas corpus, petitioner failed to show ineffective assistance of trial counsel in failing to object to dismissal of juror or in-chambers conference); *O'Donnell v. Smith*, 294 Ga. 307, 310 (1) (751 SE2d 324) (2013) (on habeas corpus, juror not allowed to impeach verdict).

13

obvious error beyond reasonable dispute, in the giving of the instruction at issue. We therefore need not reach the remaining prongs of the plain error analysis, see *Kelly*, 290 Ga. at 34 (2) n. 5, and this enumeration of error is without merit.

3. In his second enumeration of error, Howard contends that the trial court improperly instructed the jury on spoliation. While, as the State concedes, the giving of a spoliation charge is inappropriate in a criminal case, in light of the entire jury charge and the evidence presented at trial as a whole, Howard has not shown harmful error.

During the investigation, police executed a search warrant at a nearby home and found mail with Howard's name on it, and a box for a Smith & Wesson pistol with the serial number of the pistol sold to Howard and containing an exemplar shell and a partial box of Wolf ammunition.[8] These items, as well as a spent Wolf shell found at the scene and submitted to the GBI for testing, were lost by law

---

[8] An exemplar is the spent shell from a round of ammunition fired by the manufacturer; it is included with the sale of the firearm.

enforcement and never found. After a lengthy discussion and a motion to dismiss by Howard, the trial court took the motion under advisement but excluded the results of the GBI forensic testing of the missing shells, which showed that the Wolf shell recovered from the scene matched the exemplar shell in the box. After the close of evidence, the trial court declined to dismiss the charges but gave the following instruction to the jury:

> Ladies and gentlemen, if you should find that either party to this case destroyed or lost evidence in this case, and if you find that in so doing there was bad faith on the part of that party, then you would be authorized to infer that if the evidence were here, that the evidence, if available, would have been against that party's interest.

Howard objected to the giving of this instruction on the ground that it should have included the possibility of finding prejudice to the defendant as well as bad faith. The trial court declined to do so, noting that the State suggested in closing argument that Howard intentionally hid his pistol, so that including a prejudice element in the charge would have required a further instruction that the jury could infer that the fatal bullet had been fired from Howard's pistol.

15

Howard pointed out that such a charge would be improper because it would shift the burden of proof to himself. Howard now argues that the spoliation charge was burden-shifting even without the further instruction, allowing the jury to infer that the fatal bullet would have matched Howard's pistol.[9]

This Court has held that a typical spoliation charge, based upon former OCGA § 24-4-22,[10] is improper in a criminal case, even when requested by a defendant:

> This court has previously held the section inapplicable in criminal cases and violative of a defendant's right to be convicted by evidence establishing guilt beyond a reasonable doubt. . . . The charge, if given, would be more applicable to defendant than to the state and would apply to all the evidence on all counts, including the defendant's failure to testify. This,

---

[9] Howard acknowledges in a footnote that the spoliation charge also applied to the missing evidence lost by the State.

[10] The former Code section was in effect when Howard was tried in 2012. It provided:

> If a party has evidence in his power and within his reach by which he may repel a claim or charge against him but omits to produce it, or if he has more certain and satisfactory evidence in his power but relies on that which is of a weaker and inferior nature, a presumption arises that the charge or claim against him is well founded; but this presumption may be rebutted.

This provision was carried forward substantially unchanged into the new Evidence Code as OCGA § 24-14-22.

undeniably, would fly in the face of justice and the right of defendant to remain silent as well as having an eroding effect on the state's burden of proving the defendant guilty beyond a reasonable doubt.

(Citations and punctuation omitted.) *Radford v. State*, 251 Ga. 50, 53 (7) (302 SE2d 555) (1983) (affirming trial court's refusal to give spoliation charge requested by defendant).

This does not conclude our analysis, however. In *Ruiz v. State*, 286 Ga. 146 (686 SE2d 253) (2009), the trial court erred in giving a jury instruction that impermissibly commented upon the defendant's right to remain silent. We observed that

it does not follow that reversal is required. First[,] erroneous jury instructions are not judged in isolation, but rather are considered in the context of the entire jury charge and the trial record as a whole to determine whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. Second, an erroneous jury charge is not reversible unless it causes harm.

(Citations and punctuation omitted.) Id. at 150 (3).

Here, the trial court charged the jury on the burden of proof and presumption of innocence; the State's burden to prove every element of the offense beyond a reasonable doubt; that the defendant

17

has no burden of proof; that the burden never shifts to the defendant to introduce evidence or to prove innocence; and that any defense raised by the evidence must be disproved by the State beyond a reasonable doubt. In addition, the trial court instructed the jury that "[t]he defendant in a criminal case is under no duty to present any evidence tending to prove innocence and is not required to take the stand and testify in the case."

Moreover, the trial record demonstrates that the parties and the trial court considered the instruction at issue primarily in regard to the State's lost evidence, which was the focus of repeated questioning throughout the trial. The two firearms examiners for the State and for the defense testified briefly that an exact comparison of a bullet could not be made without the gun at issue, and the prosecutor argued in closing that Howard, not the State, was responsible for the absence of the gun, and suggested that Howard lost it because it would have incriminated him. The trial court, however, instructed the jury that closing arguments are not evidence. In the context of the entire charge and the trial record as

a whole, Howard has not shown a reasonable likelihood that the jury misapplied the challenged instruction, particularly since the instruction as given omitted any mention of a charge or claim against a party or the creation of a presumption "that the charge or claim against such party is well founded."

In addition, the trial record as a whole indicates that the error was harmless. Howard admitted firing his pistol at the scene, although he contended that he acted in self-defense by firing into the crowd or toward gunshots that he heard as he was running away from the scene. Moreover, a total of ten eyewitnesses saw Howard fire a pistol at the scene. Some testified that Howard fired the first shot, some that he shot Paige multiple times, and some that he then stood over Paige as he lay helpless on the ground and shot him in the head. "[T]he evidence of guilt was overwhelming, and the erroneous charge in no way pointed directly at the substance of [Howard's] defense. [Cit.]" *Ruiz*, 286 Ga. at 151 (3). Under these circumstances, the giving of the erroneous charge was harmless.

4. In his third enumeration of error, Howard asserts that his

constitutional right to be present during a critical stage of the proceedings was violated when the trial court met with a juror, all counsel, and the court reporter in chambers before excusing the juror from the jury.

> This Court has long recognized that a criminal defendant has a state constitutional right to be present during all critical stages of the proceedings against him. We have defined a "critical stage" of a criminal proceeding as one in which the defendant's rights may be lost, defenses waived, privileges claimed or waived, or one in which the outcome of the case is substantially affected in some other way. If not waived by the defendant, a direct violation of the right to be present is presumed prejudicial and requires a new trial.

(Citations and punctuation omitted.) *Hardy v. State*, 306 Ga. __, __ (__ SE2d __) (2019). That right may be waived by a defendant, however, "if the defendant personally waives it in court; if counsel waives it at the defendant's express direction; if counsel waives it in open court while the defendant is present; or if counsel waives it and the defendant subsequently acquiesces in the waiver." (Citation and punctuation omitted.) *Brewner v. State*, 302 Ga. 6, 11 (II) (804 SE2d 94) (2017). Acquiescence may occur when "a defendant remains

silent after he or she is made aware of the proceedings occurring in his or her absence." (Citation and punctuation omitted.) *Burney v. State*, 299 Ga. 813, 820 (3) (b) (792 SE2d 354) (2016). The question is whether the defendant "had sufficient information concerning [matters occurring outside his presence] to fairly construe his silence in this regard as acquiescence." Id. A trial court's findings of fact in this regard will be upheld unless clearly erroneous. See *Tookes v. State*, 306 Ga. 166, 168 (3) (829 SE2d 363) (2019).

In its order on Howard's motion for new trial, the trial court found that Howard "did have a right to be present during the discussions related to the deliberating juror, but that he waived that right both through counsel (said waiver being made in Defendant's presence) and by acquiescence." This decision was not clearly erroneous. See Tookes, 306 Ga. at 168 (3).

During deliberations, a juror sent a series of three notes asking to be relieved from jury service because of her distress and inability to deliberate. After the final note was received, the trial court proposed to examine the juror in open court, but defense counsel

requested that the juror be examined in chambers with the court reporter and trial counsel present.[11] After the proceedings in chambers concluded, the participants returned to the courtroom and the trial court announced that the juror would be replaced.

Although Howard denied being present in court when the in-chambers meeting was convened, he acknowledged that he was present on the preceding day when the juror's first note was read "asking could they be replaced." He also acknowledged that he was present when the trial court returned to the courtroom after the meeting to "put it on the record." In open court and in Howard's presence, the trial court announced that a hearing had occurred in chambers, laid out the substance of the juror's testimony in detail, and announced his decision to excuse the juror while noting it was over defense counsel's objection. Howard raised no objection to the in-chambers meeting at that time or when the verdict was returned.

---

[11] At the hearing on Howard's motion for new trial, trial counsel explained that he wanted the juror to be examined in a less public setting, hoping that he might still be able to persuade the judge to allow her to remain on the jury.

22

At the time the trial court, in Howard's presence, excused the juror and placed upon the record the substance of the examination of the juror in chambers, it is apparent that Howard had sufficient information concerning the in-chambers meeting "to fairly construe his silence in this regard as acquiescence." *Burney*, 299 Ga. at 820 (3) (b); see also *Brewner*, 302 Ga. at 12 (II) (defendant waived right to be present during trial court interview of juror after decision was announced in open court and defendant never voiced any disagreement during trial); *Fuller v. State*, 277 Ga. 505, 507 (2) (591 SE2d 782) (2004) (defendant waived right to be present at meeting in jury room with trial judge and all counsel by failing to object after learning of meeting; defendant was not "required to be silent at all times and under all circumstances" during his trial). Accordingly, Howard has waived this issue for appeal.

5. Finally, Howard asserts that his trial counsel was ineffective in failing to request a jury instruction on the principle of transferred justification. "Under that principle, no guilt attaches if an accused is justified in shooting to repel an assault, but misses and kills an

innocent bystander. [Cits.]" *Crawford v. State*, 267 Ga. 543, 544 (2) (480 SE2d 573) (1997).

To prevail on his Sixth Amendment claim of ineffective assistance, Howard must prove both that the performance of his lawyers was professionally deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Howard must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). And to prove prejudice, Howard "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one. [Cit.]" *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if an appellant

fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

At the hearing on Howard's motion for new trial, his lead counsel testified that he did not request an instruction on transferred justification because, in his view, "as I recall the theory of this case, it was pure self-defense, that he was being shot at and was shot . . . . I can't tell you whether he was shooting at somebody else and shot someone else. I can't tell you that that was the theory of this case." Counsel added that after the passage of five years, he could not recall all the facts in the case, and if the facts did fit that charge, he "was wrong."

The only evidence supporting a claim of self-defense was Howard's statements to police officers that he was shot and in response fired "into the crowd" or in the direction of the gunshots that he heard. No evidence was presented that Howard fired at a particular person, missed, and hit another. Compare *Allen v. State*, 290 Ga. 743, 743-744 (1) (723 SE2d 684) (2012) (appellant claimed

25

that he aimed at unidentified man who pointed gun at him, but missed, and bullet struck victim). And in language almost identical to that quoted in *Allen*, the trial court did instruct the jury on justification and self-defense, including that "a defendant is justified to kill or use force against *another person* in defense of self or others" (emphasis supplied) if "he reasonably believes that such threat or force is necessary to prevent death or great bodily injury to himself or a third person." See *Allen*, 290 Ga. at 746 (3).

Given that the instruction referred generally to "another person," as this Court noted in *Allen*, "considered as a whole the court's charge made clear to the jury that it should acquit appellant if it determined he was justified in firing his weapon, regardless of whom the bullet struck. [Cit.]" Id. Moreover, "the principle of transferred justification does not apply if the accused shot carelessly and in reckless and wanton disregard of the danger resulting to the bystander." (Citation and punctuation omitted.) *Crawford*, 267 Ga. at 544 (2) (defendant's testimony that he turned and fired blindly at noise did not support charge on transferred justification or self-

26

defense).[12] Howard's statement to police that he fired in the general direction of the crowd while running away does not constitute slight evidence supporting a jury instruction on self-defense or justification.

Howard therefore has failed to show deficiency on the part of his trial counsel in not requesting a charge on transferred justification.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 7, 2019.
Murder. Spalding Superior Court. Before Judge Sams.
*Brian Steel*, for appellant.
*Benjamin D. Coker, District Attorney, E. Morgan Kendrick,*

---

[12] Howard contends that the State argued that "even if the jury believed Appellant's defense on this issue, Appellant, by killing an unarmed innocent man was guilty of murder under the trial court's jury instructions." But the State at the time was contending that Howard's actions in shooting into a crowd constituted implied malice, which the prosecutor defined as "where *there appears to be no provocation* and all of the circumstances of the killing evidenced an abandoned and malignant heart. You don't care what you do." (Emphasis supplied.) Similarly, the trial court instructed the jury that "[m]alice may, but need not, be implied *when no considerable provocation appears* and when all the circumstances of the killing show an abandoned and malignant heart. It is for you, the jury, to decide whether or not the facts and circumstances of this case . . . show malice." (Emphasis supplied.)

*Elizabeth H. Brock, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.