**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 20, 2020**

# In the Court of Appeals of Georgia

A19A2134. MATOS-BAUTISTA v. THE STATE.

MERCIER, Judge.

A jury found Angel Matos-Bautista guilty of trafficking in heroin.[1] See OCGA § 16-13-31 (b).[2] He appeals his conviction and the denial of his motion for new trial, contending that the trial court erred in giving one particular charge to the jury, and that trial counsel provided ineffective assistance by failing to object to that charge. Finding no basis for reversal, we affirm.

---

[1] Three other individuals were also indicted (Ranferi Vega-Morales, Luis Colon-Ortiz, and Carlos Benitez-Monserrate). Each was pertinently charged with being a party to the crime of trafficking in heroin by unlawfully possessing 28 grams or more of a mixture of heroin on January 8, 2015. Matos-Bautista was tried separately.

[2] OCGA § 16-13-31 (b) (defining trafficking in heroin as possessing four grams or more of any mixture containing heroin, and providing for enhanced sentencing based on substance amount).

"Following a criminal conviction, the defendant is no longer presumed innocent, and we view the evidence in the light most favorable to sustain the verdict." *Reason v. State*, _ Ga. App. _ (836 SE2d 223, 224) (2019) (citation and punctuation omitted). So viewed, the evidence presented at trial showed the following.

Matos-Bautista was arrested on January 8, 2015 for allegedly trafficking heroin on that date. Months earlier, in November 2014, narcotics officers with the Gwinnett County Police Department began a wiretap investigation of a suspected narcotics dealer, Carlos Ramirez. Pursuant to the investigation, after obtaining warrants, officers monitored calls on Ramirez's phone and dozens of associated phones. As a result of the wiretapping, officers identified another suspect, Ranferi Vega-Morales, as being at the top of the narcotics organization they were investigating. Officers then identified Matos-Bautista as a driver for Vega-Morales and intercepted a series of calls from December 3, 2014 through January 2, 2015 involving those two men. In one such call, on December 3, Matos-Bautista and Vega-Morales discussed deactivating one of their phones and replacing it with another one that is "not an iPhone." The lead investigator in the case, who the court qualified as an expert in drug trafficking organizations, testified that the location of an iPhone is "easier to track," and opined that the parties were discussing "changing phones to avoid

2

detection from law enforcement." In a call on December 4, Matos-Bautista asked Vega-Morales if the latter could send someone else to pick up an item from a shopping center because Matos-Bautista had noticed that a particular vehicle (a "300") was still in the shopping center. Vega-Morales directed Matos-Bautista to "pretend to buy something [so] as to not raise suspicion as to what he was doing there." The investigator testified that officers were indeed conducting surveillance from a Chrysler 300 vehicle at that location on that day, and that Matos-Bautista and Vega-Morales were the subjects of the surveillance. He added that individuals who are the subjects of police surveillance sometimes conduct "heat check[s]" in which they attempt to determine whether law enforcement officers are conducting surveillance activities in the area.

In a call placed about 20 minutes later, Matos-Bautista asked Vega-Morales where he was and told him he had just seen someone get out of one vehicle and into another; after discussing the details of what Matos-Bautista had seen, including whether one of the vehicles had left the scene, Vega-Morales instructed Matos-Bautista to go to the house and turn off his phone, saying that they would talk at the house. The investigator opined that in that discussion the men were trying to

3

determine if Matos-Bautista was being followed; the investigator added that phones can be tracked by GPS.

In a phone call on December 20, 2014, Matos-Bautista told Vega-Morales that "the big one is for 129," and Vega-Morales said "that is for 95," then reminded Matos-Bautista to "take the colanders." The investigator testified that, based on his expertise and knowledge, colanders are used to sift artificial sweeteners and heroin together in order to "cut the drugs to make more to sell for a better profit." In a call later that day, Vega-Morales told Matos-Bautista to change his meeting location because he had been using that location too frequently. On December 30, at about 10:00 p. m., Vega-Morales instructed Matos-Bautista by phone to stop at a store and purchase large zip-loc bags. Matos-Bautista said he would.

On January 8, 2015, investigators monitored a call on Vega-Morales's phone in which he and an unidentified male ("UM33") discussed "a half of white" at "24."[3] In the opinion of the investigating officer, the men were discussing a deal for one-half of a kilogram of heroin for $24,000. Text messages on that date also showed Vega-Morales and UM33 negotiating a price. At 9:33 p.m., Vega-Morales told UM33 that

_____

[3] As of the date of the trial, investigators had not determined the identity of UM33.

4

"he'll be with you in about 30 or 40 minutes[.]" At 10:38 p.m., Vega-Morales told UM33 someone would bring "that" in about 15 to 20 minutes. Then, at 10:59 p.m., there was a call in which Matos-Bautista told UM33, "Cousin, I will be there in 10 minutes, 8 minutes."

Minutes later, at around 11:00 p.m., a police officer initiated a traffic stop of Matos-Bautista's vehicle in connection with the investigation (and for alleged traffic violations). Matos-Bautista was the vehicle's driver and sole occupant. The officer asked Matos-Bautista for consent to search the vehicle, and Matos-Bautista consented. The officer opened the center console next to the driver's seat and found therein a brown tin "Buchanan" liquor container. He opened the container and found a chunky white substance inside cellophane (a large zip-loc bag, as described by the lead investigator). Crime lab testing later showed the substance to be a mixture of heroin and fetanyl, weighing 489.65 grams. The officer held up the bag and asked Matos-Bautista, who was then about 12 feet away, "Is this drugs?" Without hesitating, Matos-Bautista replied, "[Y]es," and lowered his head. The officer found approximately $1,300 cash in his pocket. At 11:31 p.m., after Matos-Bautista was stopped, Vega-Morales and UM33 discussed by phone the fact that Matos-Bautista had not arrived and was not answering his phone.

Matos-Bautista took the stand at trial, testifying that he was a taxicab driver who frequently drove Vega-Morales to various locations and ran errands for him. Matos-Bautista testified that on January 8, Vega-Morales asked him to go to a liquor store to buy a bottle of Buchanan's Special Reserve. Matos-Bautista bought the liquor and delivered it to Vega-Morales at the latter's house. After Matos-Bautista handed Vega-Morales the liquor, Vega-Morales left the room, returned, handed the liquor and cash to Matos-Bautista, and instructed him to deliver the liquor to Vega-Morales's friend's house. Matos-Bautista testified that he did not open the container, which was sealed, and thought that it contained liquor.

1. Matos-Bautista contends that the trial court erred by giving the State's requested jury charge on "deliberate ignorance," asserting that the jury charge "excused the State from having to prove *intent*, an essential element present in every . . . criminal prosecution . . . and an element central to [his] defense." (Emphasis supplied.) He argues that the charge erroneously instructed the jury that the element of intent could be satisfied by inferences drawn from proof that he deliberately closed his eyes to what would have been obvious to him, when the deliberate ignorance instruction applies only to the *knowledge* element of a criminal offense. Matos-Bautista asserts that his defense was that he lacked both knowledge and criminal

6

intent, as he did not know there was heroin inside the liquor container, and he was not intentionally delivering heroin or participating in the trafficking scheme.

At issue is the following charge given by the trial court:

I charge you that the elements of *knowledge or intent* may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's *knowledge* of a fact may be inferred from willful blindness to the existence of the fact. Again, whether or not you draw any such inference is a matter solely within your discretion.

(Emphasis supplied.)

This Court reviews questions regarding jury charges de novo. *Hines v. State*, 350 Ga. App. 752, 759 (2) (830 SE2d 380) (2019); see *Jordan v. State*, 322 Ga. App. 252, 255 (4) (a) (744 SE2d 447) (2013).[4] Georgia law requires that jury charges be "correct statements of the law and [that they], as a whole, would not mislead a jury of ordinary intelligence." *Hines*, supra at 759 (2) (footnote and punctuation omitted).

---

[4] Because the parties agree on appeal that a proper objection to the charge was made, the de novo standard of review applies, rather than the plain error standard (which applies where there was no objection at trial). See OCGA § 17-8-58 (b); *Jordan*, supra.

7

A crime consists of the joint operation of an act or omission to act and intention or criminal negligence. Since intent is a fact question seldom capable of proof by direct evidence, it may be inferred and is manifested by circumstances connected with the perpetration of the offense. Whether such requisite intent existed is a question for the trier of fact and, on review, an appellate court will not disturb such factual determination unless it is contrary to the evidence and clearly erroneous.

*Thomas v. State*, 176 Ga. App. 771, 773 (3) (337 SE2d 344) (1985) (citations and punctuation omitted); see OCGA § 16-2-1 (providing that criminal intent is an essential element of every crime where criminal negligence is not involved). "The 'intention' of OCGA § 16-2-1 does not mean an intention to violate a penal statute but an intention to commit the act prohibited thereby." *Thomas*, supra at 773 (citation and punctuation omitted). "A person will not be presumed to act with criminal intention but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6. Generally, a defendant puts his intent at issue when he pleads "not guilty." *Burgess v. State*, 349 Ga. App. 635, 641 (3) (824 SE2d 99) (2019). As for "knowledge," it "may be proved by facts and circumstances from which a jury could reasonably infer that a defendant

knowingly possessed contraband." *Fernandez v. State*, 275 Ga. App. 151, 154 (2) (619 SE2d 821) (2005) (citations and punctuation omitted).

> A charge on deliberate ignorance is

> appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution. A court should not instruct a jury on deliberate ignorance when the evidence points to actual knowledge or no knowledge on the defendant's part.

*Williamson v. State*, 300 Ga. App. 538, 549 (6) (685 SE2d 784) (2009) (footnotes and punctuation omitted). "[T]he deliberate ignorance instruction, when appropriate, provides another way to satisfy the *knowledge* element of a criminal offense, not the *intent* element." *Hutchins v. State*, 326 Ga. App. 250, 259 (3) (756 SE2d 347) (2014) (citations and punctuation omitted; emphasis supplied); *Williamson*, supra at 549-550 (6). Consequently, this Court has held that a charge on deliberate ignorance that equates intent with knowledge, or which tends to confuse those concepts, is erroneous. *Hutchins*, supra.

Here, the trial court erred by instructing the jury that the element of intent could be satisfied by inferences drawn from proof that Matos-Bautista "deliberately closed

9

his eyes to what would otherwise have been obvious to him." See *Williamson*, supra at 549 (6). However, the trial court's giving of an erroneous jury instruction does not necessarily require reversal. See *Howard v. State*, 307 Ga. 12, 19 (3) (834 SE2d 11) (2019). An erroneous jury instruction is not judged in isolation, but rather is considered in the context of the entire jury charge and the trial record as a whole, and does not constitute grounds for reversal unless the error causes harm. Id. at 19-20; see generally *Able v. State*, 312 Ga. App. 252, 256 (2) (718 SE2d 96) (2011).

Viewing the trial court's entire jury charge and the record as a whole, we conclude that the error was harmless. We note that although the trial court's deliberate ignorance instruction initially stated that "knowledge *or intent* may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes" to what would have otherwise been obvious, the court then added: "Stated another way, a defendant's *knowledge* of a fact may be inferred," thus omitting the erroneous "or intent" language. (Emphasis supplied.)

Further, in addition to the challenged charge, the trial court pertinently instructed the jury as follows: the State has the burden of proving each element of the crime beyond a reasonable doubt; facts that merely place upon the defendant a grave suspicion or raise speculation or conjecture of guilt are not sufficient to authorize

10

conviction; circumstantial evidence is proof of facts by direct evidence from which the jury may infer other related facts; a conviction may be based on circumstantial evidence; and the jury must determine the credibility of witnesses. The court also instructed the jury: the State must prove intent beyond a reasonable doubt; intent may be shown in many ways, including inferred from the proven circumstances or inferred when it is the natural and necessary consequence of an act; and the defendant is not presumed to have acted with criminal intent, though the jury may find such intention (or its absence) upon a consideration of words, conduct, and other circumstances connected with the charged act. In addition, the court instructed the jury that the State has the burden of proving knowledge beyond a reasonable doubt, defined knowledge and stated how it may be shown, and gave the deliberate ignorance instruction immediately thereafter. In the context of the entire charge, there is no reasonable likelihood that the jury misapplied the challenged instruction. See generally *Howard*, supra; compare *Williamson*, supra (finding harmful error where, at jury's request, the trial court repeated the erroneous charge, and evidence of appellant's involvement in the conspiracy was not overwhelming).

Finally, Matos-Bautista and the arresting officer (among other witnesses) testified at trial, such that the jury was able to assess their credibility and consider all

11

of the circumstances surrounding Matos-Bautista's possession of the heroin. The jury was authorized to find from the evidence presented that Matos-Bautista possessed criminal intent and, consequently, to find him guilty beyond a reasonable doubt of trafficking in heroin. See generally *Huckabee v. State*, 287 Ga. 728, 734 (6) (b) (699 SE2d 531) (2010) (any error in court's giving deliberate ignorance charge was harmless in light of overwhelming evidence of appellant's guilt); *Smith v. State*, 350 Ga. App. 496, 500 (829 SE2d 776) (2019); *Thomas*, supra. Thus, considering the entire charge and record, the court's giving of the erroneous charge on deliberate ignorance was harmless. *See Howard*, supra at 21 (3).

2. In his initial appellate brief, Matos-Bautista claimed that his trial attorney rendered ineffective assistance by failing to object to the deliberate ignorance charge. However, in his reply brief, Matos-Bautista agreed with the State that defense counsel made a proper objection to the charge. The parties having agreed that counsel did properly object, no deficient performance in that regard has been shown. See generally *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010) (to prevail on an ineffective assistance of counsel claim, a defendant must show counsel's performance was deficient and that the deficiency resulted in prejudice to the defendant).

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*

12