S07A1779. GREEN v. THE STATE.
(657 SE2d 221)

SEARS, Chief Justice.

The appellant, Andre Green, appeals from his convictions for felony murder and arson stemming from the death of Frances McKeller.[1] On appeal, Green contends that the evidence is insufficient to support his convictions and that the trial court erred in sentencing him for the arson conviction since arson served as the underlying felony for the felony murder conviction. Although we conclude that the evidence is sufficient to support Green's conviction for felony murder, we also conclude that the trial court erred in sentencing Green on the arson conviction. Accordingly, we affirm the trial court's judgment in part and vacate it in part.

1. The evidence at trial would have authorized a jury to find that Green rented a downstairs room in the house of the victim and that, on the evening of March 9, 2005, Allen Young and David Evans, two of McKeller's neighbors, noticed that her home was on fire. Young and Evans knocked on the front door, but nobody answered. Young then broke a window and unlocked the front door. Young stated that he

---

[1] The crimes occurred on March 9, 2005. On January 9, 2006, Green was indicted for malice murder, felony murder (with arson serving as the underlying felony), and arson. On October 4, 2006, Green was acquitted of malice murder, but the jury deadlocked on the other two charges. On January 25, 2007, after a retrial, a jury found Green guilty of both felony murder and arson. The trial court sentenced Green to life in prison for the felony murder conviction and to twenty concurrent years in prison for arson. On February 6, 2007, Green filed a motion for new trial, and on June 18, 2007, Green amended his motion for new trial. On July 11, 2007, the trial court denied Green's motion for new trial as amended, and on August 1, Green filed a notice of appeal. On August 8, the appeal was docketed in this Court. The case was subsequently submitted for decision on the briefs.

could see smoke in the downstairs part of the house and that, when he entered the house, he saw Green standing in the victim's living room. Young asked Green where the victim was, and Green responded that he thought she was upstairs. Young then asked Green whether he knew the house was on fire, and Green stated that he did not know because he had been asleep. Young added that Green was wearing shoes and was completely dressed, that he did not look like he had been just awakened, and that Green's bed was neatly made and did not look like it had been recently slept on. Young added that, at that point, the ceiling above Green's bed began to bubble and fall down. Young then asked Green how to get to the victim's room, and Green led Young to the door leading upstairs and knocked on it. When there was no response, Young opened the door, and attempted to go upstairs. He testified, however, that thick smoke and heat kept him from being able to go upstairs.

David Evans testified essentially to the same sequence of events as Young, reiterating that when he and Young went into the house, Green was standing in the living room and was fully dressed. Evans added that Green's bed was made very nicely "like nobody had[ ] been in there."

Firefighters soon arrived at the burning home, finding the victim's body in her upstairs bedroom. Bruce Gorley, an arson investigator, testified that the victim's kitchen had a number of oil lamps in it and that he found the parts of an oil lamp dismantled on the second floor of the victim's home. The parts of the lamp, including the base with only a small amount of oil remaining in it, the lamp's wick, and the lamp's globe, were all found near the top of the stairs leading to an upstairs sitting room where the fires in question originated. The sitting room was next to the victim's bedroom. Gorley testified that there were "two fires . . . started within this room." He elaborated that there was evidence of the use of an accelerant at two places in the sitting room. One point of origin was the right arm of a love seat that was heavily burned and another point of origin was on the floor below the left arm of the love seat. Gorley added that "an ignitable liquid [was] poured as a trailer" and connected the two areas. Gorley stated that he thought the oil lamp was the fuel source and "had been poured on the floor" and then trailed over the arm of the love seat. Gorley added that the fire on the love seat resulted in a smoldering fire that produced heavy soot in the upstairs of the house, and that the fire on the floor burned hotter, quicker, and cleaner than the fire on the love seat. Green's downstairs bedroom was directly below the sitting room, and the fire on the floor of the sitting room burned a hole through his ceiling.

Gorley testified that the victim's body was found slumped over the barrel portion of a barrel lamp that was over four feet long and

that the lamp appeared to have been purposefully lodged under the bed in order to prop up the body. Gorley added that the lamp had been on a table next to the victim's bed; that the table was covered with soot except where the feet of the lamp had been positioned on it; and that the light bulb on the lamp was not broken. Similarly, Gorley testified that there was a distinct, bare footprint in the soot next to the victim's body and that the victim's feet were smaller than the foot that left the footprint. According to Gorley, the footprint in the soot would not have been made while the second fire was burning due to the danger to the person involved. Moreover, he stated that the victim's skin was blistered and that the victim's bedroom was never hot enough to cause the blistering, leading him to conclude that the victim had been moved from the sitting room to her bedroom. Various factors, including the footprint in the soot, the lack of soot where the feet of the lamp had been, and the blistering on the victim's body, led Gorley to conclude that the smoldering, sooty fire on the love seat occurred first, that the victim's body was moved after that fire, and that the fire on the floor then occurred. Gorley added that, based on his knowledge of fires, he did not believe that Green could have been in his bedroom and not know that there was a fire in the sitting room directly above him. Moreover, Gorley testified that there was no evidence of a forced entry into the house other than the broken glass caused by the victim's neighbors.

Pam Ross, a detective with the Fitzgerald Police Department, testified that, on the evening of the fire, she took Green to the police department for an interview and that at that time, he was not a suspect. Ross added that Green was neatly dressed and wearing shoes. Green worked a night shift at a local Wal-Mart, and Ross testified that Green told her that the victim was home all day that day; that the victim made him lunch, which he ate about 1:00 p.m.; that he then went to sleep; that he woke up about 7:30 p.m. to take a shower; that he heard somebody moving around upstairs; and that he then lay back down and went to sleep. Green added that he was later awakened by breaking glass and people shouting that the house was on fire. He added that he then got up and opened his door and that two guys who lived across the street were standing in the door to the living room shouting that the house was on fire. After Green was arrested several days later, he made a statement to Ross in which he related nearly the same sequence of events but stated that, when he was awakened by breaking glass, he could see and smell smoke. Green also told Ross that he began renting a room from the victim because he could not afford the bills for the house that he had previously lived in.

The victim's mother testified that she talked to her daughter almost every day, that she and the victim were very close, that the

victim told her that Green had not been paying his rent, and that she (the victim) was going to ask Green to pay her. The victim's mother also testified that she spoke with Green about 11:45 a.m. on the day of the crime and that Green told her that her daughter was not home. She asked Green to tell her daughter to call her back and Green stated that he would. The victim's mother, however, did not receive a call from her daughter during the afternoon, and she called her house again about 4:45 p.m. Green again answered the phone and told her that the victim was asleep. One of the victim's relatives, however, testified that she saw the victim walking toward her house about 4:15 p.m., and the victim's granddaughter testified that the victim drove her to tennis practice at 4:30 p.m., and that she saw her grandmother again about 5:30 p.m. at her house.

At trial, Green testified that, after he finished working the night shift in the early morning hours of March 9, he came home, ate breakfast, and went to sleep until about 12:00 p.m. to 12:30 p.m. He added that, when he woke up, he could hear the victim in the kitchen preparing lunch. Green testified that, about 12:30 p.m., the victim left the kitchen and that he then went into the kitchen, prepared and ate his lunch, and then went to sleep until about 5:00 p.m. Green testified that he then took a shower, lay down across the bed, and went back to sleep. According to Green, he was awakened by someone knocking on the door, and he then got up and put on his clothes. He was preparing to answer the door when someone broke out the glass. Green testified that he then ran into the living room and saw Young and Evans standing there. He added that they told him the house was on fire. Green stated that he did not see any smoke, smell any smoke, or see any flames at that point. Green added that, after he saw Young and Evans, he went to his room and put on some shoes. According to Green, they then attempted to go upstairs but were unable to do so because of the smoke and heat. Green added that the door to his bedroom was about three feet from the stairs.

Although the evidence is circumstantial, we conclude that, viewing the evidence in a light most favorable to the verdict, it was sufficient for a rational trier of fact to find Green guilty of felony murder and arson beyond a reasonable doubt. In this regard, however, Green contends that there was a reasonable hypothesis that an intruder entered the house, set the fires, and caused the victim's death.[2] We disagree. First, the neighbors' testimony that Green was standing completely dressed in the living room when they burst into

---

[2] When evidence is completely circumstantial, it must exclude every reasonable hypothesis save that of his guilt. See OCGA § 24-4-6; *Walker v. State*, 282 Ga. 406, 407 (651 SE2d 12) (2007).

the house, as well as their testimony that there was smoke in the living room, refutes Green's story that he had been asleep and was unaware that there was a fire in the house. Moreover, the fact that there was no evidence of a forced entry into the house other than the entry made by the neighbors militates against Green's contention that someone entered the house and set the fire. In addition, the fact that the door to Green's bedroom was immediately adjacent to the stairwell going upstairs to the sitting room and the fact that the sitting room where the fires occurred was directly above Green's bedroom would have authorized the jury to conclude that, if there had been an intruder in the house, Green would have known of the intruder's presence. In this regard, an intruder would have had to break into the house, take an oil lamp from the dining room into which Green's bedroom opened, go upstairs within a few feet of Green's bedroom, struggle with the victim and start two fires, go back downstairs past Green's bedroom, and exit the house, all without Green noticing any of this activity. Finally, the fact that Green had begun living with the victim because he could not afford his previous home, that Green had failed to pay rent to the victim, and that the victim was planning to ask Green to pay his rent raise an inference that Green had a motive to kill the victim.

In conclusion, these factors would have authorized the jury to conclude that Green's hypothesis that an intruder caused the victim's death was not reasonable, and that, instead, the only reasonable hypothesis was that Green set the fires that caused the victim's death.

2. Green next contends that the trial court erred by sentencing him for the arson conviction since the crime of arson served as the underlying felony for the felony murder conviction. For the reasons that follow, we conclude that the trial court erred in sentencing Green for the arson conviction.

When a defendant is convicted of felony murder and is also separately convicted of the felony that served as the underlying felony for the felony murder conviction, the conviction for the underlying felony merges into the felony murder conviction.[3] The State contends, however, that Green committed two separate arsons, one based on the fire that started on the love seat and the other based on the fire that started on the floor. The State further contends that the arson based on the love seat fire served as the underlying felony for the felony murder conviction, that the arson based on the fire that started on the floor served as the basis for the separate arson

---

[3] *Bolston v. State*, 282 Ga. 400, 401 (651 SE2d 19) (2007); *Billings v. State*, 278 Ga. 833, 834 (607 SE2d 595) (2005); *Johnson v. State*, 254 Ga. 591, 596 (331 SE2d 578) (1985).

conviction, and that the trial court thus properly sentenced Green for the arson conviction. However, because neither the indictment nor the trial court's charge to the jury specified that Green was being tried for two separate arsons, we cannot conclude that the jury found Green guilty of one arson to support the felony murder conviction and of a separate arson to support the independent arson conviction.[4] Accordingly, we must vacate Green's conviction and sentence for arson.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

DECIDED FEBRUARY 11, 2008.

*John L. Tracy, Timothy L. Eidson,* for appellant.
*Denise D. Fachini, District Attorney, Cheri L. Nichols, Assistant District Attorney, Thurbert E. Baker, Attorney General, Mary N. Kimmey, Assistant Attorney General,* for appellee.

---

[4] See *Lindsey v. State,* 262 Ga. 665, 665-666 (424 SE2d 616) (1993).