307 Ga. 106
FINAL COPY

S19A0749. SMITH v. THE STATE.
S19A0750. HAWKINS v. THE STATE.
S19A0751. SEAY v. THE STATE.

BLACKWELL, Justice.

In February 2010, there was a fight at a nightclub in Albany, followed by a shooting in a nearby parking lot. A patron of the club, LeSheldon Stanford, was killed in the shooting, and a security guard for the club, George Ferguson, was wounded. Three years later, Shanard Smith, Anthony Hawkins, and Shuntavious Seay were tried together on charges arising from the fight and the shooting, and a Dougherty County jury found them guilty of murder and other crimes. They appeal from the judgment of conviction entered upon the verdict of the jury. With respect to Smith, we see no reversible error and affirm his convictions. As to Hawkins and Seay, we affirm their convictions for aggravated assault, which are based on their participation in the fight inside the club. We reverse, however, their

convictions for murder because the evidence at trial was insufficient to prove beyond a reasonable doubt that they were parties to the shooting in the parking lot outside the club.[1]

1. Viewed in the light most favorable to the verdict, the evidence presented at trial shows the following. In the early morning

---

[1] Smith, Hawkins, and Seay were indicted by a Dougherty County grand jury on December 19, 2012. Several other individuals were also named in the indictment, including Jacory Butts, Cavoris Barney, and Antonio Seay. Smith was charged with the murder of Stanford with malice aforethought, two counts of murder of Stanford in the commission of a felony (aggravated assault upon Stanford), an aggravated assault upon Stanford, an aggravated assault upon Ferguson, a violation of the Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq., and possession of a firearm during the commission of a felony. Hawkins and Seay both were charged with the felony murder of Stanford (aggravated assault), an aggravated assault upon Stanford, and a violation of the Street Gang Act.

Smith, Hawkins, Seay and three co-defendants were tried together in February 2013. The trial court directed a verdict of acquittal for all the defendants on the Street Gang Act charge, and the jury found Smith, Hawkins, and Seay guilty of the other crimes with which each was charged. The trial court sentenced Smith to imprisonment for life for malice murder, a concurrent term of imprisonment for twenty years for the aggravated assault upon Ferguson, and a consecutive term of imprisonment for five years for possession of a firearm during the commission of a felony. The other counts merged or were vacated by operation of law. The trial court sentenced Hawkins and Seay to imprisonment for life for felony murder and a concurrent term of imprisonment for twenty years for the aggravated assault. (With regard to the other three defendants, two received the same sentences as Hawkins and Seay, and the other had been acquitted of all charges.) Smith, Hawkins, and Seay timely filed motions for new trial, which they later amended. The trial court denied their motions in July and August 2018. They timely appealed, and their cases were docketed to the April 2019 term of this Court and submitted for decisions on the briefs.

hours of February 14, 2010, Stanford and a group of friends and relatives went to a club in Albany known as "Nab's" or "Brick City." The club was crowded with people drinking and dancing. At some point, several young men began to act aggressively toward Stanford, flashing gang signs and "bounc[ing] around in [his] face." A witness later identified Smith as one of the men flashing gang signs. Eventually, a large group — between 15 and 30 people — began to fight Stanford, chanting "EMF" as they punched and kicked him. "EMF" apparently refers to "East Mafia Family," a street gang that operates in the Albany area, and evidence shows that Smith, Hawkins, Seay, and a number of other individuals at the club on the morning of February 14 were affiliated with that gang. Stanford tried to fight back, and at some point, Jacory Butts — also affiliated with EMF and a part of the crowd attacking Stanford — said something like, "Hey Blood, let's get that chopper [and] show him what it'll do."[2]

---

[2] A law enforcement officer testified that he understood the word "chopper" to mean a "big gun," like "an AK-47 or a[n] M-16, or something to that effect."

Ferguson and some other security guards eventually pulled Stanford away from his attackers and escorted him from the club. But the commotion and fighting continued, spilling out into the parking lot. Ferguson tried to lead Stanford to his car but failed to do so because people continued to "fight [Stanford] and jump on him and stuff." Ferguson described the situation as "crazy because people was driving up in cars, stopping in cars, jumping out of cars on the street, and somehow or another they just knew who this guy [Stanford] was and they'll jump out and come and jump on him."

Ferguson and Stanford separated when Ferguson left to attend to a confrontation between another security guard and Antonio Seay. The security guard had exchanged blows with Antonio and knocked him down. Smith and Michael Stephens were with Antonio, and Ferguson told the three men to leave the premises. At that point, according to Ferguson, Smith said "f**k this sh*t" and ran to a car in the parking lot across the street from the club.

In the meantime, Kevin Brown, who had accompanied Stanford to the club, saw him in between two cars with "some guys

4

. . . jumping on top of the cars, off the cars on top of him." After the men stopped jumping on Stanford, Brown approached him and asked if he was okay. Stanford replied that he was, but he appeared to be looking at someone coming up behind Brown. At that point, Brown heard gunshots and dropped to the ground, and Stanford said, "I've been hit."[3]

Ferguson testified that, when he turned his attention back to Stanford, he saw Stanford leaning against a car as if he were tired. Ferguson then heard a shout, and when he turned around, he saw Smith standing with a gun, which was pointed at Ferguson. Smith shot Ferguson in the arm and chest. Ferguson dropped to the ground and heard other shots being fired. He then heard someone say "Blood EMF" or "EMF Blood." Ferguson testified that he did not see anyone other than Smith with a gun, and he did not see anyone accompanying Smith at the time of the shooting.

---

[3] The evidence is conflicted about the lapse of time between the fight and the shooting. One witness indicated that the shooting started a couple of minutes after the fight ended, another witness said it was about five minutes, and yet another suggested the interval was closer to ten minutes.

Several other witnesses testified about the shooting. Rolando Frazier said that he saw Smith shoot Stanford with a black handgun that looked like a .380-caliber pistol. Stephens testified that, when he exited the club during the commotion, he saw Smith run past him, curse, and fire four or five shots. Another patron, Quintus Porter, testified that, as he walked outside the club, he saw Smith fire a black gun at Stanford. All three witnesses had identified Smith as the shooter before trial in photographic lineups. Antonio testified that, when he was in jail with Smith, he asked Smith directly if Smith had shot Stanford, and Smith replied that he "wished none of that sh*t would have never happened" and that he "didn't mean to do it."

The evidence against Hawkins and Seay was considerably weaker than the evidence against Smith. Ferguson testified that Hawkins and Cavoris Barney were among the people "in the club fighting." Ferguson also testified that, when he "broke the fight up," he told Hawkins and Barney to leave Stanford alone, and they listened to him and left. Ferguson testified that Seay was present

inside the club but was not "involved in anything," and Ferguson did not interact with him at all. Frazier wrote a statement for investigators that was admitted into evidence. In that statement, Frazier said that he had seen "Peanut, Akheem, D, Ant, Slab, C-Low and a few other people fighting on the dance floor." "Ant" and "C-Low" referred to Hawkins and Seay, respectively.[4] Porter also had given a written statement to investigators in which he said that, after the shooting, Smith, Seay, and three others "ran and got in a four-door car." At trial, however, Porter testified that he did not actually see Smith get into the car with Seay and the others; rather, he saw Seay and the others enter the car and then saw Smith "running towards that way."

---

[4] Frazier was a reluctant witness at trial, having indicated earlier that he did not want to testify. On taking the stand, Frazier was simply asked to read his initial statement to investigators (rather than to testify about what he saw) and to read his written recantation of that statement (Frazier said that Smith had asked him to write the recantation). On cross-examination, Frazier was questioned by Smith's attorney about his observations of the shooting, and Frazier explained how he saw Smith with a gun. But Frazier was not asked any questions about seeing people "fighting on the dance floor," nor was he asked to confirm that his statement was, in fact, true.

Hawkins and Seay both were interviewed by investigators,[5] and recordings of those interviews were played for the jury. Seay admitted that he was at the club, but he denied that he participated in the fight, was a member of EMF, or knew who shot Stanford. As for Hawkins, he denied being at the club on the day in question. An investigator, however, testified that Hawkins came back for another interview (which was not recorded) and admitted then that he was at the club and that "they" were yelling "EMF" as Stanford was beaten. Hawkins also told the investigator that he tried to break up the fight.[6]

With regard to physical evidence, investigators recovered five .380-caliber shell casings from the scene. An autopsy revealed that Stanford had sustained six gunshot wounds, including a wound to

---

[5] Both were read the Miranda warnings and agreed to talk. See Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[6] On direct examination, an officer testified that Hawkins told him that "he passed one or two licks on the guy. He hit the guy once or twice." On cross-examination, however, the officer took back that testimony, explaining that "I was reading from the wrong report. I apologize." The officer then elaborated that Hawkins never actually told him that he hit anyone, but rather said that he was "trying to break up the fight."

his chest that caused extensive hemorrhaging. Stanford also suffered multiple scratches and blunt force injuries to his head and body. The medical examiner testified that the cause of Stanford's death was "multiple gunshot wounds."

## S19A0749. Smith v. The State

2. *Sufficiency of the Evidence*

Smith does not dispute that the evidence is sufficient to sustain his convictions. But consistent with our usual practice in murder cases, we independently have reviewed the record to assess the legal sufficiency of the evidence. We conclude that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Smith was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

3. *Admission of Portions of Recorded Interview with Investigators*

9

Smith's sole claim of error on appeal is that the trial court erred when it admitted a recording of his interview with an investigator in which the officer called him a "killer" and a "cold-blooded dude" who would "take a life." These statements, Smith argues, lacked any probative value and were unduly prejudicial. See OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Pretermitting whether the trial court erred when it admitted these portions of the interview, we conclude that any such error was harmless. See Fletcher v. State, 303 Ga. 43, 47 (810 SE2d 101) (2018) (a non-constitutional evidentiary error is harmless if "it is highly probable that the error did not contribute to the verdict" (citation and punctuation omitted)). The evidence against Smith was very strong. Four eyewitnesses — Ferguson, Frazier, Stephens, and Porter — identified Smith as the shooter.[7] Moreover, Smith

---

[7] Smith argues that Ferguson did not actually see Smith shoot Stanford because Ferguson dropped to the ground as soon as he was shot himself. But given that Ferguson saw only one person (Smith) shooting, that the shots continued in rapid succession after Ferguson was hit, and that Ferguson was

implicitly admitted that he shot Stanford when he told Antonio in jail that he "didn't mean to do it." No one testified at trial that anyone else had a gun. Given the strength of the evidence against Smith, it is highly unlikely that the statements in the interview about which Smith complains had any effect on the verdict of the jury. See Tanner v. State, 303 Ga. 203, 208 (3) (811 SE2d 316) (2018) ("Considering the strength of the properly admitted evidence of [the defendant's] guilt and the context of a police interview in which . . . [the defendant] was claiming that he had nothing to do with [the victim's] death, the jury was highly unlikely to have been swayed by the detective's passing comment that he thought [the defendant] would go to prison."); Hood v. State, 299 Ga. 95, 105-106 (3) (786 SE2d 648) (2016) (erroneous admission of evidence under Rule 403 was ultimately harmless given the strong evidence of defendant's guilt). See also Jones v. State, 301 Ga. 544, 551 (3) (802 SE2d 234) (2017).

within sight of Stanford, the jury reasonably could infer from Ferguson's testimony that Smith was the person who shot Stanford.

11

4. *Sufficiency of the Evidence*

Hawkins and Seay claim that the evidence is insufficient to sustain their convictions for murder and aggravated assault. With regard to aggravated assault, we disagree. The indictment alleged that Hawkins and Seay committed an aggravated assault by participating in the fight inside the club, which involved an assault upon Stanford with "fists and feet" used as deadly weapons. Neither Hawkins nor Seay disputes that the beating of Stanford by multiple individuals inside the club amounted to aggravated assault under OCGA § 16-5-21 (a).[8] And at least some evidence shows that both Hawkins and Seay participated in that beating. Ferguson testified that Hawkins was involved in the fight inside the club. And in his

---

[8] The statute defines "aggravated assault," in part, as assault "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2). See also Dasher v. State, 285 Ga. 308, 311 (3) (676 SE2d 181) (2009) ("Although fists and feet are not considered deadly weapons, they may be found to be a deadly weapon by the jury depending on the manner and means of their use, the wounds inflicted, etc." (Citation and punctuation omitted.)).

12

written statement to investigators, Frazier identified both Hawkins and Seay as among the people "fighting on the dance floor." This evidence is not especially strong, but it is legally sufficient to prove that Hawkins and Seay were a part of the melee inside the club. Moreover, some evidence established that Hawkins and Seay both were affiliated with EMF and that the crowd fighting inside the club was chanting "EMF." Hawkins lied to investigators in his initial interview, falsely denying that he was at the club on the night in question. And the jury could have inferred that Seay lied when he denied in his interview that he was a member of EMF. And in light of other evidence that the fight in the club was focused primarily on beating Stanford — a beating that no one disputes amounted to aggravated assault — the jury reasonably could have inferred that Hawkins and Seay were parties to the aggravated assault. See Smith v. State, 277 Ga. 95, 96 (586 SE2d 629) (2003) ("Under OCGA § 16-2-20, a person who intentionally aids or abets the commission of the crime, or intentionally advises, encourages, hires, counsels, or procures another to commit the crime[,] may be convicted of the

13

crime as a party to the crime."). Although the evidence against Hawkins and Seay is far from overwhelming, it is just enough to sustain their convictions for aggravated assault. See Jackson, 443 U. S. at 319 (III) (B).

Their convictions for the murder of Stanford, however, are a different matter altogether. The indictment alleged in pertinent part that Hawkins and Seay committed felony murder by virtue of their participation in an aggravated assault upon Stanford with "fists and feet . . . and with handguns." According to OCGA § 16-5-1 (c), "[a] person commits the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." And it is well settled that, for the purposes of OCGA § 16-5-1 (c), a person "causes the death of another human being" in the commission of a felony when the predicate felony is the *proximate* cause of the death. See Currier v. State, 294 Ga. 392, 394 (1) (754 SE2d 17) (2014) (noting that OCGA § 16-5-1 (c) "imposes liability for the reasonably foreseeable results of criminal conduct if

14

there is no sufficient, independent, and unforeseen intervening cause" (Citation and punctuation omitted.)).

Here, as we have discussed, there is enough evidence to prove beyond a reasonable doubt that Hawkins and Seay were parties to an aggravated assault upon Stanford with "fists and feet" inside the club. *That* assault, however, was not the immediate cause of Stanford's death. Indeed, the testimony of the medical examiner that the cause of death was "multiple gunshot wounds" was undisputed. Although the medical examiner said that Stanford also sustained several "blunt force injuries" to his head, neck, back, and extremities — apparently as a result of the beating and kicking by the sizeable crowd of which Hawkins and Seay were a part — the medical examiner confirmed that those injuries were not life-threatening.

Nor is there evidence sufficient to prove beyond a reasonable doubt that the beating and kicking of Stanford with "fists and feet" inside the club and the shooting of Stanford in the parking lot were one and the same assault. The shooting was attenuated in time, in

place, and most significantly, in circumstance from the earlier fighting with "fists and feet." The beating and kicking began and mostly occurred inside the club, and although some individuals may have continued to try to fight Stanford after he was escorted from the club, it is undisputed that the fighting apparently ceased at some point — at least two minutes, and perhaps as many as ten — before the shooting. More importantly, there is no evidence that Smith — who fired the fatal shots — was a part of the crowd beating and kicking Stanford inside the club or that any member of that crowd fired shots at Stanford or otherwise was involved in the shooting. Around the time Stanford was escorted from the club, Smith was with Antonio (who was involved in a separate fight with a security guard), was confronted by Ferguson and told to leave the premises, became angry and proceeded to a parking lot across the street, returned with a gun, shot Ferguson, and then shot Stanford. The beating, kicking, and shooting cannot on these facts properly be characterized as parts of a single, continuous assault.

That leaves two theories by which the State might conceivably have proved Hawkins and Seay guilty of felony murder as alleged in the indictment. The evidence presented at trial, however, is not legally sufficient to prove either theory beyond a reasonable doubt. First, the State perhaps might have proved that Hawkins and Seay were parties to the separate assault upon Stanford with a handgun. But there is no evidence that Hawkins or Seay was communicating or coordinating with Smith — or even in his company — during the beating or at any time prior to the shooting.[9] There is no evidence that either of them knew Smith had a gun, that they encouraged, counseled, or solicited Smith to use his gun, or that they aided and abetted Smith in shooting Stanford. See OCGA § 16-2-20 (b) (3), (4). The State did present evidence that Smith, Hawkins, and Seay — and numerous other individuals at the club on the morning of

---

[9] There was evidence that Smith was flashing gang signs in the presence of Stanford inside the club and prior to the outbreak of the fight. But there is no evidence that Smith joined the crowd of which Hawkins and Seay were a part that participated in the beating of Stanford inside the club, nor is there evidence that Hawkins or Seay was with Smith when he was flashing gang signs.

17

February 14 — were affiliated with EMF. Although a common gang affiliation sometimes may tend to show concerted action, we have stated before that gang affiliation, without more, is not enough to render one gang member chargeable for the crimes of another. See Chavers v. State, 304 Ga. 887, 890 (2) (823 SE2d 283) (2019) ("[A] defendant cannot be convicted for merely being associated with a gang that commits criminal acts; the defendant must personally commit an enumerated offense himself." (Citation and punctuation omitted.)). Here, there is not enough additional evidence of concerted action to prove beyond a reasonable doubt that Hawkins and Seay were parties to the shooting in the parking lot.

The other theory by which the State might conceivably have proved Hawkins and Seay guilty of felony murder is that the aggravated assault with "fists and feet" inside the club set in motion a chain of events, unbroken by any intervening cause, that led foreseeably to the fatal shooting in the parking lot. Again, there is insufficient evidence to sustain such a theory. Absent concerted action between Smith, Hawkins, and Seay and in furtherance of

18

which Smith fired the fatal shots, absent evidence that Smith shooting Stanford was reasonably foreseeable to Hawkins and Seay when they were a part of the crowd beating and kicking Stanford inside the club, and absent evidence that the assault with "fists and feet" left Stanford helpless to defend against the subsequent and separate shooting by Smith, the shooting would break the causal chain between the death of Stanford and the earlier beating in which Hawkins and Seay were complicit.

Perhaps a full understanding of what happened on the morning of February 14, 2010 would lead to the conclusion that Hawkins and Seay were as culpable in the death of Stanford as Smith himself. But the jury had only the evidence that was available to and presented by the State, and that evidence fails to prove beyond a reasonable doubt that Hawkins and Seay were parties to the shooting that caused Stanford's death. Accordingly, we reverse their convictions for murder.[10]

---

[10] In light of our determination that Hawkins and Seay's murder convictions cannot stand, we also vacate their sentences for aggravated assault

5. *Admission of Co-defendants' Statements*

Hawkins and Seay contend that the trial court should not have admitted evidence of certain out-of-court statements of three co-defendants who did not testify at trial, at least without limiting instructions. Although they did not object at the time the evidence was offered, they say that the evidence was so obviously inadmissible that its admission was plain error, and in any event,

and remand for resentencing. As we have discussed, the theory of prosecution in this case was that the murder arose in part from the aggravated assault upon Stanford with "fists and feet." And as we have explained, there is insufficient evidence to sustain Hawkins and Seay's convictions for murder under that theory. But at the time of sentencing, it would have appeared to the trial court that the aggravated assault for which Hawkins and Seay were sentenced was inextricably intertwined with the murder for which they also were sentenced, such that the trial court should have merged the aggravated assault into the murder (and imposed no separate sentence at all for aggravated assault). See <u>Leeks v. State</u>, 296 Ga. 515, 524 (7) (769 SE2d 296) (2015); <u>Green v. State</u>, 283 Ga. 126, 130 (2) (657 SE2d 221) (2008). With our reversal of their murder convictions, the failure to merge the aggravated assault is not error. But given the causal relationship that the trial court would have perceived at the time of sentencing between the aggravated assault and the murder, we lack confidence that the trial court would impose the same sentence for aggravated assault in the absence of a murder conviction. For that reason, we vacate the sentences for aggravated assault in Hawkins and Seay's cases, and we remand for the trial court to exercise its sentencing discretion, knowing that aggravated assault is the only crime of which Hawkins and Seay stand convicted in this case.

they add, the failure of their lawyers to object amounts to a denial of the effective assistance of counsel. We disagree.

To establish plain error, Hawkins and Seay would have to show, among other things, a reasonable probability that the putative error affected the outcome of the trial. See Davis v. State, 305 Ga. 640, 643 (2) (827 SE2d 265) (2019). And to prove their claim of ineffective assistance, they would have to show not only that the failure of their lawyer to object was objectively unreasonable, but also "a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different." Miller v. State, 285 Ga. 285, 286 (676 SE2d 173) (2009) (citation and punctuation omitted). "[T]his Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." Hampton v. State, 302 Ga. 166, 168-169 (2) (805 SE2d 902) (2017).

Here, Hawkins and Seay have failed to establish that they were prejudiced by the admission of the evidence about which they

21

complain. Some of the out-of-court statements at issue do not incriminate Hawkins or Seay in any way, some merely concern facts that no one at trial disputed, and the rest are merely cumulative of other properly admitted evidence. Even if some or all of the statements should not have been admitted, none of these statements prejudiced Hawkins or Seay. See Hurt v. State, 298 Ga. 51, 58 (3) (b) (779 SE2d 313) (2015) (even if certain recordings were improperly admitted, they were cumulative of other evidence, and so the defendant failed to show prejudice); Marshall v. State, 299 Ga. 825, 828 (2) (b) (792 SE2d 350) (2016) (no prejudice where the effect of the challenged statements "was merely cumulative of other undisputed evidence"). Accordingly, their claims of error predicated on the admission of these statements are without merit.

6. *Expert Testimony of Gang Officers*

Hawkins and Seay contend that they were denied the effective assistance of counsel when their trial lawyers failed to object to the testimony of three officers who were permitted to testify as experts

on gangs.[11] Hawkins and Seay argue that the gang experts' testimony was objectionable on four grounds, but for the reasons that follow, we conclude that none of these objections would have had merit.[12]

First, Hawkins and Seay say that the officers gave expert opinion testimony that was based on inadmissible hearsay, as some

---

[11] After one of these officers testified, Hawkins and Seay moved to strike his entire testimony on the grounds that it violated the Confrontation Clause and the rules against hearsay. (They did not move to strike the testimony of the other two officers.) The trial court took the motion under advisement, saying only that it was "inclined" to deny it, and neither Hawkins nor Seay followed up or attempted to secure a final ruling. Hawkins and Seay now allege that the trial court erred when it failed to grant their motions to strike, but they concede that the trial court never made a final ruling on those motions, and so they also argue, alternatively, that their lawyers rendered ineffective assistance when they failed to preserve the motion. We conclude that the motion to strike was not preserved. See Willis v. State, 304 Ga. 686, 695 (5) (820 SE2d 640) (2018) (defendant's claim "has not been preserved for appellate review, because [he] has failed to show, nor is it apparent to us, that it was ruled on in the trial court"). Accordingly, we will review Hawkins and Seay's claim about the motion to strike under the framework of ineffective assistance.

[12] Because Hawkins and Seay have failed to show that any part of the gang officers' testimony was properly objectionable, they have failed to establish that their trial lawyers were deficient in failing to object to such testimony. See Perera v. State, 295 Ga. 880, 884-885 (3) (b) (763 SE2d 687) (2014) ("There is no deficient performance when an attorney fails to object to admissible evidence." (Citation and punctuation omitted.)); Wesley v. State, 286 Ga. 355, 357 (3) (e) (689 SE2d 280) (2010) ("Trial counsel was not ineffective for failing to make a meritless objection."). Accordingly, Hawkins and Seay have failed to demonstrate ineffective assistance of counsel in this

23

of their knowledge of gangs in general and EMF in particular was based not on first-hand observation, but on information obtained from informants, victims, and other police officers. But the applicable rule of evidence, OCGA § 24-7-703 ("Rule 703"), allows experts to base their opinion testimony on inadmissible "facts or data," so long as these "facts or data" are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[13] Hawkins and Seay do not dispute,

_____

regard.

[13] Rule 703 provides, in full:

The facts or data in the particular proceeding upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, such facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Such facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Rule 703 is substantially similar to Federal Rule of Evidence 703. We have explained that, when we consider the meaning of provisions in the new Evidence Code that are borrowed from the Federal Rules of Evidence, "we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." Olds v. State, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016). See also State v. Almanza, 304 Ga. 553, 558 (2) (820 SE2d 1) (2018) ("[U]nder the

and we see no reason to doubt, that the sources on which the three officers relied as a basis for their opinions — including gang-related training, participation in gang-related investigations, information from other police officers, and conversations with gang members — are reasonably relied upon by gang experts, and so the admission of their testimony did not violate Rule 703. See United States v. Steed, 548 F3d 961, 975-976 (II) (B) (11th Cir. 2008) (even if expert officer's testimony was based on inadmissible hearsay, it did not violate Federal Rule of Evidence 703 because "general training and experience, discussions with other law enforcement officers, participation in searches and arrests of criminal suspects, and literature about trends in law enforcement" are sources that are "reasonably relied upon by experts in the law enforcement field"). See also United States v. Garcia, 447 F3d 1327, 1336 (III) (A) (3) (11th Cir. 2006).[14]

new Evidence Code, when the provision is materially identical to a federal rule, it also reflects the federal rule's meaning, displacing any other.").

[14] Hawkins and Seay allege that Rule 703 was violated when one of the

Second, Hawkins and Seay say that the officers' testimony violated the Confrontation Clause because, in gaining knowledge about gangs, the officers spoke to other people, and the primary purpose of such conversations was to establish past events potentially relevant to later criminal prosecutions. But even assuming, without deciding, that the Confrontation Clause applies to facts or data on which experts base the opinions to which they testify, neither Hawkins nor Seay identifies any particular "testimonial" hearsay statement that formed the basis for any

---

officers disclosed inadmissible evidence to the jury. See OCGA § 24-7-703 ("facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion . . ."). But Hawkins and Seay do not identify any specific "facts or data" that they contend were inadmissible. Rather, this claim appears to be part of their general argument that the officers' opinions were *based on* some unspecified inadmissible hearsay. As discussed above, this argument is unavailing.

Hawkins and Seay also cite Green v. State, 266 Ga. 237, 239 (2) (466 SE2d 577) (1996), which says that, while "an expert can base his opinion on facts which he did not personally observe," the expert "must base his opinion on facts supported by evidence in the case; he cannot base his opinion on what he has heard in private conversations with others." (Citations and punctuation omitted.) Green, however, was decided under the old Evidence Code, and to the extent it contradicts Rule 703, it has been abrogated by the adoption of the new Evidence Code. See Almanza, 304 Ga. at 558 (2); Smith v. State, 299 Ga. 424, 429-430 (2) (b) (788 SE2d 433) (2016).

particular opinion given by any of the officers. See <u>Franklin v. State</u>, 298 Ga. 636, 640 (2) (784 SE2d 359) (2016) ("[T]he Confrontation Clause applies only to out-of-court statements that are testimonial in nature." (citing <u>Crawford v. Washington</u>, 541 U. S. 36, 68-69 (V) (C) (124 SCt 1354, 158 LE2d 177) (2004)). As a result, their claim that the officers' testimony violated their confrontation rights is purely speculative and does not show ineffective assistance of counsel. See <u>Norton v. State</u>, 293 Ga. 332, 339 (7) (d) (745 SE2d 630) (2013) ("[S]peculation that error may have occurred is insufficient to show any deficiency on the part of counsel, or prejudice therefrom, and is insufficient to show reversible error." (Citation and punctuation omitted.)); <u>Dunlap v. State</u>, 291 Ga. 51, 53 (3) (727 SE2d 468) (2012) (same). See also <u>Ringold v. State</u>, 304 Ga. 875, 885 (823 SE2d 342) (2019) (Nahmias, P. J., concurring) (it is a "fundamental principle of appellate practice" that the appellant "must be able to show reversible error . . . on the existing record"); <u>Young v. State</u>, 232 Ga. 285, 290 (206 SE2d 439) (1974) ("The burden of showing error is upon the appellant.").

Third, Hawkins and Seay argue that the officers' testimony about general gang structure and activities — such as testimony about gang initiation procedures, rank structures, age ranges, disciplinary rules, symbols, and crimes — was irrelevant.[15] Such testimony, however, was clearly relevant to show a violation of the Street Gang Terrorism and Prevention Act, a crime charged in the indictment, notwithstanding that the trial court directed a verdict of acquittal on that charge after the State rested. See Hayes v. State, 298 Ga. 339, 342 (a) n.4 (781 SE2d 777) (2016) ("Expert testimony by a qualified law enforcement officer regarding gang activity and culture is admissible and relevant to establish that a certain named organization is in fact a 'criminal street gang.'"). See also Morris v. State, 294 Ga. 45, 49 (3) (751 SE2d 74) (2013) (officer's expert testimony "regarding the characteristics of street gangs was clearly relevant to establishing that the IRC [the 'International Robbing Club'] was in fact a 'criminal street gang'").

---

[15] Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401.

Finally, Hawkins and Seay argue that the State failed to lay an adequate foundation for the officers' testimony because it did not show that they had personal knowledge of the matters about which they testified. See OCGA § 24-6-602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter. . . ."). But the testimony at issue was that of the gang officers as *experts*, not lay persons, so Rule 602 presents no bar to such testimony. See OCGA § 24-6-602 ("The provisions of this Code section are subject to Code Section 24-7-703. . . ."). See also Advisory Committee Notes on Federal Rule of Evidence 602 ("The reference to Rule 703 is designed to avoid any question of conflict between [Rule 602] and the provisions of [Rule 703] allowing an expert to express opinions based on facts of which he does not have personal knowledge.").

7. *Closing Arguments*

Hawkins and Seay argue that the trial court erred when it denied their motions to bar the prosecuting attorney from discussing their affiliation with the EMF gang in closing argument. We

disagree. As discussed in Division 4, although evidence of gang membership is not, without more, *sufficient* to prove concerted action, it certainly is relevant for that purpose. Indeed, evidence that Hawkins and Seay were affiliated with EMF had some tendency to prove that they shared a common intent with the crowd that was chanting "EMF" as it beat and kicked Stanford. See Finley v. State, 298 Ga. 451, 453 (2) (782 SE2d 651) (2016) (trial court did not err in admitting evidence that defendant was involved in a gang, even though none of the charges against defendant were gang-related, because "evidence of gang involvement in this case supported the State's theory of how the co-indictees were affiliated and what motivated them to commit the crimes in the way that they did"). "As a general rule, closing argument is appropriate as long as it is based on evidence that is properly before the jury." Smith v. State, 284 Ga. 599, 602 (2) (a) (669 SE2d 98) (2008). See also Spiller v. State, 282 Ga. 351, 354 (3) (647 SE2d 64) (2007).

8. *Motion to Sever*

Seay alone argues that he was denied the effective assistance of counsel when his lawyer failed to move to sever his trial from that of other co-defendants. "Whether to seek severance is a matter of trial strategy, and in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." Green v. State, 302 Ga. 816, 819 (2) (b) (809 SE2d 738) (2018) (citations and punctuation omitted). At the hearing on Seay's motion for new trial, his trial lawyer did not explain why he did not seek a severance, but he did say that he did not believe a motion to sever would have been granted. His assessment was not an unreasonable one.

In determining whether a severance should be granted, the trial court must consider "whether a joint trial will create confusion of evidence and law; whether there is a danger that evidence implicating one defendant will be considered against a co-defendant despite limiting instructions; and whether the defendants are

31

asserting antagonistic defenses." Rhodes v. State, 279 Ga. 587, 589 (3) (619 SE2d 659) (2005). "[T]he burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process." Blackledge v. State, 299 Ga. 385, 388 (2) (788 SE2d 353) (2016) (citation and punctuation omitted). See also OCGA § 17-8-4 (a) (in non-death-penalty cases, defendants who are jointly indicted "may be tried jointly or separately in the discretion of the trial court").

Our review of the record fails to show, from the pretrial perspective of trial counsel, that confusion of the evidence or law would have appeared inevitable or even likely, that any defendant was pursuing a defense antagonistic to Seay, or that there was a substantial enough danger that evidence against another defendant would prejudice Seay. Because Seay's trial lawyer reasonably could believe that the motion for severance would not be granted, Seay has failed to show ineffective assistance of counsel. See Lupoe v. State,

32

300 Ga. 233, 251 (18) (794 SE2d 67) (2016) (trial counsel did not perform deficiently in failing to seek severance in a joint gang-related trial where the lawyer "did not believe that the gang evidence was strong" or that the evidence against the other co-defendants would spill over against the defendant). See also Pittman v. State, 300 Ga. 894, 898 (2) (799 SE2d 215) (2017) (trial counsel was not deficient in failing to move for severance where counsel "felt [such a motion] would have been unsuccessful").

9. *Testimony Referring to Nicknames*

Seay also argues that he was denied the effective assistance of counsel when his lawyer failed to object to testimony incorrectly suggesting that Seay was known by the nickname "Little Mike Tyson" (or something similar, referring to the boxer Mike Tyson). There was slight evidence at trial that an individual named "Tyson" was standing in the vicinity of the shooter. But the State itself discredited this evidence; there was no indication that the "Tyson" individual was involved in the fight against Stanford inside or outside the club; and we have no reason to believe that the jury was

33

confused by this nickname evidence to Seay's detriment. Thus, there is no reasonable probability that the trial lawyer's failure to object to the nickname testimony affected the jury's decision to convict Seay of aggravated assault, and so he "has not carried his burden of establishing the prejudice prong of ineffective assistance of counsel." Butler v. State, 292 Ga. 400, 408-409 (3) (c) (738 SE2d 74) (2013) (citation and punctuation omitted).

Judgment affirmed in Case No. S19A0749. Judgments affirmed in part and reversed in part, sentences vacated, and cases remanded for resentencing in Case Nos. S19A0750 and S19A0751. All the Justices concur.

D<span>ECIDED</span> O<span>CTOBER</span> 21, 2019.

Murder. Dougherty Superior Court. Before Judge Marshall.

*Woodall and Pflepsen, Keith A. Pflepsen*, for appellant (case no. S19A0749).

*Troy E. Golden*, for appellants (case nos. S19A0750 and S19A0751).

*Gregory W. Edwards, District Attorney, Melinda A. Wynne, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.